CHARLES SPURR et al. v. GEORGE SPURR et al., Appellants.

Division One, December 2, 1920.

1. **WILL CONTEST: Testamentary Capacity: Peremptory Instruction.** Where proponents make formal proof of the execution of the will and of the sanity of the testator at the time of its execution, and there is no substantial countervailing evidence offered on the issue of testamentary capacity, the court should direct the jury to find that issue in favor of proponents.

2. ———: **Undue Influence: Confidential Relations: Nurse: Business Associate.** Casual ministrations bestowed on the testator on different occasions when he was suffering from acute attacks resulting from a cancerous growth of the stomach, by his long and younger associate in business, who, together with his wife, testator's niece, is made a principal legatee, and the accompanying of testator to a distant city for a surgical operation, did not constitute said associate his nurse in the sense that such term is used to imply a confidential relation; nor do ordinary business relations, such as those in which the associate acted as agent for testator in attending to and taking part in testator's personal business affairs, the confidence in each case being limited to the particular business in hand, constitute that fiduciary or confidential relation which give rise to a presumption of undue influence in making the will; and the instructions should not tell the jury that such intimate personal service, jointly or severally, cast upon contestees the burden of showing that the will was not the result of said associate's undue influence.

3. ———: ———: **Fraud.** Testimony that the niece of the testator, who was never married, told him that his sister, who resided in St. Paul, had no affection for him, that she had complained of the trouble and annoyance he had caused her while he was sick at her home, that she had turned him out and had expressed a hope that he would soon die; that these statements were repeated by the niece's husband and his intimate associate in business, who, with said niece, was also made a principal legatee, to testator's intimate friends in St. Louis, with the expectation that they would repeat them to testator and commiserate with him upon the heartlessness and ingratitude of said sister, as they in fact did; that these statements were wholly false, and known so to be by the niece, at least; that they were made by her in an effort to monopolize the affections of testator at a time when he was afflicted with an incurable disease, to the exclusion of said sister, who theretofore had been his favorite, for the purpose of depriving the sister of any share in testator's estate and securing a corresponding advantage for herself; that the testator, whose natural egotism had been intensified by the nature and duration of his illness, believed the false statements and acted on them, as the niece had intended; and that the will in contest was the result, if believed by the jury, will constitute fraud, and being pleaded the issue of fraud should be submitted by pointed instructions requiring a finding on each constituent element of the fraud which the testimony tends to establish, the burden of proof on such issue being placed upon contestants.

4. ———: **Evidence: Testimony of Physician.** Contestees' objection to the testimony of a physician, who on behalf of contestants gave

in evidence information that came to him while attending testator in his professional capacity, should be overruled.

5. ———: **Necessary Parties.** Descendants of a nephew and niece of the unmarried testator, living at the time the will was made and named as legatees but having died prior to his death, should be brought in as parties in the will contest, if there are any such, but if there are none the petition should so allege and the allegation be proved.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields*, Judge.

REVERSED AND REMANDED.

*Henry W. Blodgett, George B. Webster* and *Walter N. Fisher* for appellants.

(1) In the absence from the record of the defendants William Jackson and Tom Spurr, or their legal representatives, no valid judgment on the will could be rendered. They were essential parties, being both legatees and heirs at law, and the court had been advised of their deaths. The motion in arrest of judgment should therefore have been sustained and in overruling it the trial court committed fatal error. Eddie v. Parke, 31 Mo. 513; Wells v. Wells, 144 Mo. 198; Parke v. Smith, 211 S. W. 62; Currant v. O'Callighan, 125 Fed. 657; Brown v. Riggin, 94 Ill. 560; Reformed Church v. Nelson, 35 Ohio St. 638; McMaken v. McMaken, 18 Ala. 576. (2) The trial court erred in admitting over the defendants' objection the testimony of Dr. Rule, the testator's attending physician and permitting him to testify as to information acquired from the testator in his professional capacity. Gartside v. Ins. Co., 76 Mo. 446; Ex parte Gfeller, 178 Mo. 267. None but the executor could waive the privilege of the deceased to have the physician's knowledge kept in confidence. Estate of Flint, 100 Cal. 309; Houston v. Simpson, 155 Ind. 62; Staunton v. Parker, 19 Hun, 55. The courts will not look with favor upon alleged impli-

ed waivers and will not permit the statute to be thus nullified. Smart v. Kansas City, 208 Mo. 162; Beave v. St. L. T. Co., 212 Mo. 357; Obermeyer v. Logeman C. M. Co., 229 Mo. 112. (3) The instructions, as a whole charge, were inconsistent, erroneous and misleading. The seventh was self-contradictory and in conflict with the sixth. (4) The instructions were erroneous in specific instances. (a) The twelfth instruction was not only in conflict with the third, and was erroneous in its declaration of the law of presumptions. Lawson, Presumptive Ev. (2 Ed.) p. 652; Richmond v. Aiken, 25 Vt. 326; Douglass v. Mitchell's Exrs., 35 Pa. St. 443; Glick v. K. C. Ry., 57 Mo. App. 104. It also submitted to the jury a proposition on which there was no evidence. (b) The ninth instruction was erroneous in that it authorized the jury to find against the will on the grounds other than those set up in the petition. It told the jury that they must so find if they believed that the testator was so weakened by the causes stated in the petition "or for any other reason" that he was susceptible to undue influence, without even requiring them to find that such influence was exercised. (c) The eleventh instruction was erroneous in that it singled out particular portions of the evidence and unduly commented upon them, and in that it omitted some of the necessary elements of undue influence. (5) There is no evidence in the record sufficient to sustain the verdict, and it was error to send the case to a jury at all. Hahn v. Hammerstein, 198 S. W. 833; Hutsell v. Burris, 199 S. W. 149; Conner v. Skaggs, 213 Mo. 334; Current v. Current, 244 Mo. 429; Winn v. Grier, 217 Mo. 420; Giboney v. Foster, 230 Mo. 131. (a) There is a total absence of evidence that testator was not of sound and disposing mind at the time the will was excuted. The only evidence as to that is strongly to the contrary. (b) There is a total failure of proof as to insanity and alcoholic dementia. The evidence of the contestants on these issues did not even tend

to support them.　(c)　There is no sufficient evidence of undue influence so exercised as to result in the production of a will different from the intent of the testator to make.　All the contestants' proof shows only such an influence as results from affection and gratitude and fails to show the exercise of even that.　Hall v. Hall, 37 L. J. (P. & M.) 40; Hutsell v. Burris, 199 S. W. 149; Hahn v. Hammerstein, 198 S. W. 833.

*Edward A. Knapp, Robert C. Grier* and *James F. Hudson* for respondents.

(1) The absence of William Jackson and Tom Spurr and their legal representatives, if any, did not invalidate the judgment, as all essential parties were before the court.　William Jackson and Tom Spurr having died before the testator.　Wattenberger v. Payne, 162 Mo. App. 434; Kischman v. Scott, 166 Mo. 214; Louis v. Luckert, 221 U. S. 554; R. S. 1909, secs. 1804, 1800; Young v. Robinson, 122 Mo. App. 195.　(2) The testimony of Dr. Rule, one of testator's attending physicians, was properly admitted.　In a will contest all claiming under the deceased, either devisees or heirs, may call the attending physician as their witness.　Thompson v. Ish, 99 Mo. 177.　(3) Appellants' objections to instructions given were not well taken, for such instructions were proper and covered by decisions of this court.　(a) The instruction referred to in appellants' brief as the "7th given for plaintiffs," as to burden of proof of sound and disposing mind and memory of testator, is a correct statement of the law and has been approved by this court.　Major v. Kidd, 261 Mo. 607; Goodfellow v. Shannon, 197 Mo. 278; Lefever v. Stephenson, 193 S. W. 841.　It appears from the face of the instruction referred to in appellants' brief as the "6th instruction given at the request of defendants" that said instruction is not inconsistent with Instruction 7.　(4) The instructions specifically objected to were proper.　(a). The instruction referred to in appellants' brief as "the 12th

instruction given at the request of plaintiffs," as to the presumption arising from fiduciary relationship, was covered by abundant testimony and in form has been approved by this court. Mowry v. Norman, 223 Mo. 475; Siebert v. Hatcher, 205 Mo. 83; Byrne v. Byrne, 250 Mo. 632; Grundmann v. Wilde, 255 Mo. 109. (b) The instruction referred to in appellants' brief as "the 11th instruction," to the effect that unequal distribution of property by the testator among his heirs was one of the circumstances which it was proper for the jury to consider in connection with the issue of undue influence, is proper under the decisions of this court. Byrne v. Byrne, 250 Mo. 632; Dausman v. Rankin, 189 Mo. 677; Mowry v. Norman, 223 Mo. 470; Grundmann v. Wilde, 255 Mo. 109. (c) The instruction referred to in appellants' brief as "instruction 9, given at the request of the contestants" as to undue influence, was proper and has been approved in form by this court. Dausman v. Rankin, 189 Mo. 699. The word "must" was not used in instruction as was stated in appellants' brief. (5) The evidence was sufficient to sustain the verdict. Turner v. Anderson, 236 Mo. 523; Naylor v. McRuer, 248 Mo. 423; Gordon v. Burris, 153 Mo. 223, 141 Mo. 602; Mowry v. Norman, 223 Mo. 463; Thomas v. Thomas, 186 S. W. 996; Ballak v. Susanka, 182 Mo. App. 458; Lefever v. Stephenson, 193 S. W. 840; Grundmann v. Wilde, 225 Mo. 109.

RAGLAND, C.—Arthur E. Spurr, a resident of the City of St. Louis, died January 29, 1916. On February 7, 1916, a writing purporting to be his last will and testament was admitted to probate by the Probate Court of the City of St. Louis. This proceeding, which is one to contest the validity of the will under the statute, was commenced March 1, 1917.

The evidence as preserved in the bill of exceptions covers more than 900 printed pages. We shall, therefore,

merely outline the salient facts disclosed by it and add such matters of detail as seem necessary for an understanding of the questions presented for determination. [Thomas v. Thomas, 186 S. W. 993, 994.]

Arthur E. Spurr was never married. He left surviving him the following collateral heirs: His brothers, George and Charles, and his sister, Lucy Ann Estes, all of whom lived in St. Paul, Minnesota; his nephew and niece, Harry and Lydia Spurr, children of a deceased brother; and his nephew and nieces, Sam Jackson, Annie Burkhead and Lillian Chappel, children of a deceased sister. These nephews and nieces all lived in England. All of these heirs were named in the will as devisees or legatees. In addition to these, two others were named as legatees, Tom Spurr and William Jackson, children respectively of the deceased brother and the deceased sister. They were living at the time the will was written, but predeceased the testator. They were named as defendants in the petition and included in an order of publication, but before the trial an affidavit of one of the defendants was filed in which it was stated that both Tom Spurr and William Jackson died prior to the death of their uncle, Arthur E. Spurr. No proof was offered at any stage of the proceeding as to whether either left lineal descendants. Such lineal descendants, if any, were not made parties, nor notified of the proceeding in any way.

In addition to the collateral heirs just mentioned others were named in the will, either as beneficiaries, or as being specifically excluded from any participation in the testator's estate. These were Martha Stone, Fred, Henry, Frank and Jane Spurr, children of George Spurr; Eddie Estes and Susan George, children of Lucy Ann Estes; John Spurr, Sarah Cleaveland, Harry Spurr, Eva Galloway and Arthur Spurr, children of Charles Spurr; and Louis A. Morse, a business associate and the fiancé of Jane Spurr. The testator's estate was valued at about $50,000. The will was executed December 17, 1912; and George Spurr, his daughter,

Jane, and Morse are the principal beneficiaries. George and Jane Spurr were each given a legacy of $5,000 and they were made the residuary legatees. In addition, Jane was given a diamond ring and locket. Morse, in addition to specific legacies of a gold watch and 25 shares of stock in the Morse-Spurr Wool Scouring Company, of the par value of $2500, was devised an undivided half interest in 160 acres of land in Washington County. Fred Spurr was given a legacy of $2000, and the remaining children of George Spurr (those other than Jane and Fred) were given $1000 each, as were the children of both the deceased brother and the deceased sister. Charles Spurr and Lucy Ann Estes were each bequeathed the nominal sum of $10. The will further provides that the children of Charles and Jane, designating them by name, shall receive nothing from the testator's estate. Fred Spurr and Morse were named executors without bond.

Charles Spurr and Lucy Ann Estes are the contestants. They attack the alleged will on the general grounds of want of testamentary capacity and fraud and undue influence. Under the first head the petition specifically alleges: (1) that for some time prior to the execution of the will and thereafter to the date of his death the testator suffered great physical pain from cancer of the stomach and other diseases, which ultimately resulted in his death, and that such diseases and pain brought about a general physical and mental impairment and produced exaggerated mental impressions and delusions; and (2) that at the time of the making of the will he was suffering from alcoholic dementia. Under the second it is charged: (1) that at the time of the execution of the will, and prior thereto, the testator had become so weak and infirm in mind and body that he was unable to attend to his affairs, that Louis A. Morse acted as his agent in and about his business, advised and guided him therein, and that he thereby acquired an undue influence over him; and (2) that Morse,

George Spurr and the latter's children, including Jane, fraudulently conspired to induce the testator to make a will leaving the greater part of his property to them, by poisoning his mind and creating false impressions therein; that pursuant thereto they made false statements to the testator, and to others for his benefit, to the effect: that plaintiffs had no love or affection for him and were ungrateful to him, that Lucy Ann Estes caused the death of their mother, that she complained of having had to take care of him when sick and of the trouble and annoyance caused her thereby, that she had refused to visit him during a later illness and had otherwise mistreated him, and that she had expressed the hope that he would soon die so that she could get his money; that these false statements were made and procured by the alleged conspirators for the sole purpose of deceiving the testator; that they did deceive him and that acting and relying upon them he was induced to make and did make the instrument purporting to be his will. The petition further charges ''that said instrument was the result of the weak, unsound mind of said Arthur E. Spurr, unduly controlled by the fraud, undue influence and over-persuasion'' of the last named defendants and each of them.

Arthur E. Spurr was about 60 years of age at the time of his death. He was born in England, but came to this country when a young man. He first engaged in farming in Minnesota. From the record here we next find him, in 1891, in the employ of the Morse Wool Scouring Company in St. Louis. He soon acquired some stock in the concern and later became its treasurer. For a number of years before his death he was the dominant force in the management of the company's business. Prior to some time in 1906, he had boarded with the family of Mrs. Carrie Schuster. At that time he left, but returned in the latter part of 1911. Thereafter he continued at Mrs. Schuster's until the marriage of Morse and Jane Spurr in 1915. He then made his home with them until his death. After 1904 it was his custom to

spend every summer from July to October with his rel-
atives in St. Paul. During that period he made several
trips to his old home in England.

Spurr seems to have been a man of great physical
vigor until about 1910, when he began to suffer from
violent headaches and from what he thought was indiges-
tion. Early in 1911 he underwent a surgical operation
at Rochester, Minnesota. His ailment was the result of
a cancerous growth in the stomach. After the operation
his health temporarily improved and he continued in
active business. In December, 1911, he again went to
England. He returned from there the following April
or May, suffering from his old trouble, very emaciated,
sick and despondent. He went to St. Paul, going first
to the home of his brother, George; after remaining
there a few days, at the solicitation of his sister, Mrs.
Estes, he went to her home. During his stay there she
prepared food especially for him, rubbed him with alco-
hol, made hot applications for him and otherwise nursed
and ministered to him. Jane Spurr, her niece, visited
him every day. At the end of two weeks he went back to
George Spurr's and remained there until he went to
Rochester for a second operation, which was performed
sometime in August. After the operation he returned
to George Spurr's and remained there, Jane nursing
him, until October when he went back to St. Louis. At
that time (October, 1912) he was greatly improved in
health and spirits. December 17th following, he ex-
ecuted the instrument purporting to be his will.

The evidence further shows that deceased was en-
dowed with a strong, active mind, and there is no ques-
tion of its continued vigor up to the time his health be-
gan to fail about 1910. Even after that there were no
symptoms of a mental breakdown. In a general way it
is disclosed that, during the greater parts of the years,
1911 and 1912, particularly, he suffered pain and phys-
ical discomforts of a trying character; that he was dis-
turbed mentally by the recurring thought that his malady

was probably incurable; that he was blue and discouraged; that he was irritable and impatient and flew into a rage if crossed; and that, because of his natural disposition to want to dominate, he was a difficult patient for his physicians to control. Plaintiffs' witnesses testified to several episodes as having occurred at intervals from 1906 to 1912, in which were displayed peculiar, eccentric and sometimes violent conduct on the part of Spurr, but neither this not the testimony as a whole constitute substantial evidence of the slightest mental impairment, much less want of testamentary capacity. There is no evidence of a condition remotely approaching that of alcoholic dementia.

The evidence gives the distinct impression that Spurr had a forceful personality and was imperious in disposition; that he had an over-mastering desire to dominate every situation of which he was a part; and that he was bitter in his dislikes and relentless in his efforts to visit punishment on those who had the temerity to displease him. Early in his business career he pushed his associates aside, and assumed control without let or hindrance from them. In his social life he demanded a recognition above that accorded his fellows. He showed resentment if a fellow-boarder shared in any marked attentions or favors—these he deemed due entirely to himself. He made plain his displeasure if his relatives failed to yield him the deference he thought due himself as the financially successful member of the family who was able to bestow, and did bestow, gratuities on the others. He was greatly incensed that his brother, Charles, on a visit to England, failed to go and look at a tombstone that he, Arthur, had erected at the graves of their father and mother, because it was to him an evidence of marked personal disrespect to himself. In his illness a distinct element of his suffering, apparently, was the sense of outrage he felt because the disease baffled him—was a thing that he could not master and thrust from him.

When Spurr first went into the employ of the Morse Wool Scouring Company, Louis A. Morse was a young man just out of school. He was a son of the president of the company and went to work for the concern at about the same time that Spurr did. He learned the trade of wool-scourer under Spurr's tutelage. Although Spurr was by many years young Morse's senior, a friendship was formed that remained unbroken until Spurr's death. They became inseparable companions; they were always seen together on the streets, at places of amusement and at social functions. Morse went with Spurr on the latter's visits to his relatives at St. Paul and on one trip accompanied him to England. He acquired and maintained a friendly intimacy with Spurr's kinspeople and with the members of the different families with whom Spurr boarded. When Spurr was confined to his bed with brief illnesses, Morse nursed and waited on him. Morse sometimes cut his hair and shaved his neck and occasionally wrote letters for him, Spurr dictating them. For five or six years prior to the breakdown of Spurr's health, they bought and sold wool together as a speculative enterprise independent of the business of the Morse-Spurr Company. The buying season was from April or May to July. Sometimes they went out into the country together to buy wool, at others singly. Spurr furnished all the capital and when Morse went alone he checked against a deposit made by Spurr for that purpose. If the proposed purchases were of any magnitude, it seems that Morse merely took options and did not close the deals until Spurr had approved. In the summer of 1915, when traveling in the west, Spurr gave all the expense money into the keeping of Morse who paid all the bills. Notwithstanding, Spurr was at all times, sick or well, the dominant personality. For all their friendship and mutual affection Morse played the somewhat humiliating role of secretary and valet to Spurr. He never was Spurr's nurse in any real since. And we have been unable to find any substantial

evidence that he ever "advised, guided, or directed the deceased in his business or personal matters." On the contrary Spurr often good naturedly ridiculed Morse in the presence of their mutual friends as a "fat-head" who would starve to death if left to manage his own business.

Until an occurrence in 1912, presently to be narrated, Spurr manifested a great affection for his sister, Lucy Ann Estes. She seemed to be his favorite of the brothers and sisters. She was the youngest, and he brought her over from England to make her home with him. While he was on the farm she kept house for him and devoted herself entirely to his interests. After he came to St. Louis and she married and went to St. Paul, he wrote her frequently, visited her and made her numerous presents. He advised her with respect to the education of her son and assisted her and her husband in acquiring a home. On his regular summer visits to St. Paul prior to 1912, he slept at the home of his brother, George. This was because his sister lived in cramped quarters and did not have the room to comfortably entertain him. When he returned from England in April, 1912, desperately ill, he first went to George Spurr's. A few days later his sister, who was then occupying her new home, induced him to come to her house for a while. His condition was such that he required nursing and attention, day and night, of the most exacting kind. Jane came every day and remained quite a while with him. At the end of three weeks he returned to George Spurr's house, whereupon Jane installed herself as his nurse and continued to nurse him until he went to Rochester for the second operation. During this time Mrs. Estes went to see him every two or three days, but she was coldly received by George Spurr's family. When Arthur returned after the operation they did not send Mrs. Estes word, but after a few days she learned of his return from another source and at once hurried over. She encountered an atmosphere of silent hostility

and constraint. She greeted her brother, but he responded without affection or warmth. She then turned to Jane Spurr and upbraided her for not having notified her of his return. Thereupon, Arthur said to her, according to Mrs. Estes, ''Lucy, they don't want you here; they say you turned me out; they say that you were always knocked up; that you killed mother,'' and that she replied, ''Arthur, you ought to be ashamed of yourself to talk to me in this way after all that I have done for you. I helped you get a start to put you where you are to-day.'' She then left him and never saw or communicated with him afterward. Louis Morse returned from St. Paul in advance of Arthur Spurr's coming in October. When he came he called upon Mrs. Schuster and in her presence and that of her daughter he told about Mrs. Estes having complained of having had to care for her brother, of her not wanting him at her house, and of her having said in response to a telephone call. ''He'' (referring to Arthur) ''is not dead yet.'' On being asked by Mrs. Schuster where he got his information, he said that Mrs. Estes had told it to Jane. When Spurr returned to St. Louis, his sister's alleged heartless and ungrateful conduct was frequently referred to in conversations between him and intimate friends and he expressed great bitterness towards her. On the day that he made the will, after its execution, he remarked, ''I have fixed Lucy and Charles.'' Mrs. Morse and her husband give a very different version of what occurred at St. Paul, but that does not concern our present purpose.

Sometime in 1910, or shortly prior thereto, George and Charles Spurr became involved in a lawsuit, resulting in such ill-feeling that they and their families ceased to visit or communicate with each other. So far as may be gleaned from the evidence, Arthur Spurr's resentment against Charles grew out of gossip that he had heard on his last visit to England, to the effect: (1) that he, Arthur, had caused the lawsuit between George and Charles, or had sided with George; and (2) that

Charles had failed on his visit to go see the tombstone erected by Arthur. There is no evidence that George Spurr or his family made any false statements to Arthur concerning Charles. There are circumstances, however, that tend to show that they fostered and kept alive the estrangement.

Under the instructions both issues, that of testamentary capacity and that of undue influence, were submitted to the jury for determination. They were directed to return a verdict for contestants if they found either issue in their favor. The verdict and judgment were for plaintiffs and the defendants appeal.

I. The proponents made formal proof of the execution of the will and of the sanity of the testator at the time and, as there was no substantial countervailing evidence offered on the issue of testamentary capacity, the jury should have been directed to find that issue in their favor. [Sanford v. Holland, 276 Mo. 457, 468.]

Testamentary Capacity.

II. The trial court, after submitting to the jury the issue of undue influence generally, instructed them that if they found from the evidence that for sometime immediately prior to the execution of the will Morse "had acted as agent for said deceased in attending to and taking part in the business and personal affairs of the deceased, advised, guided and directed the deceased in his business and personal matters, acted as nurse for and constantly followed the deceased around, was constantly in the company of the deceased and that the deceased looked to said Morse for advise, counsel and direction," then the law cast upon the contestees the burden of showing that the will' was not the result of Morse's undue influence. The evidence in respect to the relation existing between Morse and the testator at the time of the execution of the will and prior thereto is summarized in a preceding paragraph. It fails to disclose any basis whatever for the submission to the jury of whether either. Morse "advised, guided

Confidential Relation.

or directed deceased, in his business and personal matters," or "deceased looked to said Morse for advice, counsel or direction." It does show, among other things, that the association of the two men had been close and intimate and that Morse had sometimes waited upon Spurr when the latter was sick. But the casual ministrations bestowed upon Spurr on different occasions when he was suffering from acute attacks of his illness and the accompanying him to Rochester for an operation did not constitute Morse his nurse in the sense in which that term is used to imply a confidential relation. The evidence further shows that in a way Morse "had acted as agent for said deceased in attending to and taking part in the business and personal matters of deceased," as for example, when paying their joint expenses on a western trip with money furnished by Spurr, and when buying wool with Spurr's money for their joint account. Unquestionably this agency to some extent and for some purposes made Morse a fiduciary of Spurr. Had Morse misappropriated the funds entrusted to him for the specific purposes mentioned, there is no doubt but that in a proper case he could have been treated as a trustee. But in each of the instances referred to, so far as the acts themselves speak, the confidence reposed in Morse by Spurr was limited to the particular business in hand. From such confidences it cannot be inferred that Spurr reposed such confidence in Morse generally that he sought his advice or was subject to his influence in making the will. In other words these ordinary business relations do not constitute that fiduciary or confidential relation which gives rise to a presumption of undue influence. To recapitulate, neither the long continued association and friendship of Spurr and Morse, nor the many intimate personal services rendered the former by the latter, nor their business relations, whether considered singly or conjunctively, was sufficient to put upon the contestees the burden of showing that the will was not the result of Morse's undue influence. [Page on Wills, sec. 416 et seq. and cases cited.]

The instruction under consideration in advising the jury to the contrary was erroneous.

III.   There was no substantial evidence of undue influence in the sense of coercion, but the contestants made a case clearly entitling them to go to the jury on the issue of fraud.   They introduced evidence tending to show that the defendant, Jane Morse, *nee* Spurr, told the testator that his sister, Mrs. Estes, had no affection for him, that she had complained of the trouble and annoyance he caused her while sick at her home, that she had turned him out, and that she had replied to an inquiry concerning him, "He is not dead yet," thereby implying a hope on her part that he would soon die; that these statements were also made by the defendant, Louis Morse, to the testator's intimate friends in St. Louis, with the expectation that they would repeat them to him and commiserate with him on the heartlessness and ingratitude of his sister, as they in fact did; that these statements were wholly false and known so to be by Jane Spurr at least; that they were made by her in an effort to monopolize the affections of the testator to the exclusion of his sister, who had theretofore been his favorite, for the manifest purpose of depriving the latter of any share in the testator's estate and of securing a corresponding advantage for herself; that the testator whose natural egoism had been intensified by the nature and duration of his illness readily believed the false statements and acted on them, as Jane Spurr had intended that he should, with the will in question as the result.   These facts, if established, would constitute such fraud as would avoid the will.   [Gordon v. Burris, 153 Mo. 223, 241; In re Budlong's Will, 27 N. E. 945; 1 Underhill on Wills, sec. 152.]   On the state of the evidence presented by the record, it was the only question that should have been sent to the jury, and it should have been submitted by a terse pointed instruction requiring a finding as to each of the constituent elements of the fraud pleaded.   On such issue the contestants would have

the burden of proof. [Gay v. Gillilan, 92 Mo. 250; Sanford v. Holland, supra.]

IV.   The trial court properly overruled defendants' objection to the testimony of Dr. John B. Rule, who on behalf of the contestants gave in evidence information

Physician.   that came to him in his professional capacity while attending testator as his physician. [Thompson v. Ish, 99 Mo. 160, 177.]

V.   The point is made by appellants that the lineal descendants of Tom Spurr and William Jackson, legatees who predeceased the testator, should have been made parties. If there were any such descendants, by virtue of Section 546, Revised Statutes 1909, they become legatees named in the will upon the deaths of their respective ancestors (Wattenbarger v. Payne, 162 Mo. App. 434.), and were necessary parties (Wells v. Wells, 144 Mo. 198). But as stated there was no proof as to whether Spurr and Jackson left children or grandchildren and there is no presumption one way or the other. [Johnson v. Johnson, 170 Mo. l. c. 56.] It affirmatively appears from the face of the proceeding, therefore, not that all parties necessary to the complete determination of the cause have not been brought in, but only a possibility that such is the case. Whether such disclosure by the record would necessitate a reversal of the judgment we need not decide because of the errors already noted. On another trial this question can be eliminated by making the descendants of the deceased legatees, if any, parties, or, if there are none, by alleging that fact in the petition and making proof accordingly.

Because of error in the giving of instructions the judgment is reversed and the cause remanded for another trial. *Brown* and *Small, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur except *Woodson, J.,* not sitting.