WILLIAM F. HAHN, FRED A. HAHN, JULIUS HAHN, WALTER GAERTNER, FRANK H. GAERTNER, WILLIAM H. GAERTNER, BENJAMIN H. GAERTNER, FRANK J. HACK, FRANK J. HACK, Administrator of the Estate of LAURA HAHN HACK, and ARTHUR HACK, a Minor, by his Father and Natural Guardian, FRANK J. HACK, Appellants, v. OLIVER F. W. BRUESEKE and CARL M. SCHOENBECK, Executors of the purported last Will and Testament of JOHANNA LINDHORST, OLIVER F. W. BRUESEKE, CARL M. SCHOENBECK, EMMA GAERTNER, EDNA BRUESEKE, RUDOLPH W. SCHOENBECK, LOUISA CARSTENS, HATTIE CARSTENS and ANNA HUEBSCH.—155 S. W. (2d) 98.

Division One, July 11, 1941.

Rehearing Denied, October 30, 1941.

*Cox, Blair, Kooreman & Wallach* for appellants.

*Arnim Beste* and *John H. Nolde* for respondents.

DALTON, C.—Action to contest the will of Johanna Lindhorst, deceased, on the ground of fraud and undue influence. At the close of all the evidence the court directed a verdict sustaining the will, and judgment was entered on the verdict. Contestants have appealed.

Testatrix died December 16, 1937, in the City of St. Louis seized and possessed of real estate and personal property. She was 83 years of age and left no children or other descendants, but was survived by nieces and nephews. She had been married three times. Her last husband died in 1931. Plaintiffs (contestants) are (1) the children of August H. Gaertner, a deceased brother of testatrix, (2) the children of Louisa Hahn, a deceased sister of testatrix, and (3) the husband and son of Laura (Hahn) Hack, who died subsequent to the institution of the suit, and the administrator of her estate. Proponents are the children of Fredericka Schoenbeck (a deceased sister of testatrix), the executors, and the other legatees named in the will.

By the will, executed March 8, 1935, minor legacies were provided for Laura (Hahn) Hack (now deceased), Edna (Schoenbeck) Brueseke and Oliver F. W. Brueseke, her husband, Rudolph W. Schoenbeck, and Carl M. Schoenbeck (nephews), Louisa Carstens and Hattie Carstens, relatives of testatrix's last husband, Emma Gaertner, widow of testatrix's brother, and Anna Huebsch, a friend. All of the residue of the estate was devised and bequeathed to Rudolph W. Schoenbeck, Carl M. Schoenbeck and Edna (Schoenbeck) Brueseke, with Oliver F. W. Brueseke and Carl M. Schoenbeck as executors without bond. Testatrix's other nephews, four Gaertners and three Hahns, were not mentioned.

The petition alleged that the will was procured by undue influence, conspiracy and fraud on the part of Carl M. Schoenbeck, Oliver

F. W. Brueseke and Edna (Schoenbeck) Brueseke while they were occupying a confidential fiduciary relationship to testatrix. Fraud allegations in conventional form are fully set forth, and are based upon alleged implantation in the mind of testatrix of false beliefs "discrediting" to contestants and "offensive to testatrix."

 This is an action at law. We are not concerned with the weight and value of the testimony or the credibility of the witnesses. We must determine whether, upon a most favorable view of the whole evidence and all favorable inferences therefrom, a submissible case was made for a jury on either ground stated in the petition. We shall attempt to state the evidence most favorable to contestants, considering their evidence as true, disregarding all countervailing evidence and inferences and all other evidence offered by proponents, except in so far as such evidence may be considered as aiding contestants' case. We agree with appellants that "the evidence tending to support the validity of the will has no function to perform on this appeal," but in view of the way the case was tried and appellants' statement, brief and argument, we find it rather difficult to determine exactly what evidence of proponents is considered as aiding contestants' case. In some instances the cross-examination of proponents' witnesses proceeds upon the theory that certain facts shown only by proponents' witnesses are conceded to be true and are favorable to contestants' case. In presenting the matter here, appellants' counsel view almost the entire evidence as supporting and aiding contestants' case; even denials by proponents of facts sought to be established by contestants are argued in aid of contestants' case.

Only proponents' evidence deals with the actual execution of the will. The will was executed in testatrix's home in the presence of Frederick William Schindler, Jr., a brother-in-law of Oliver F. W. Brueseke, and Richard W. Borrenphol, the husband of a cousin of Edna (Schoenbeck) Brueseke. Mr. Brueseke, according to Mr. Borrenphol's "best impression," had phoned him the day before about the matter. Mr. Schindler had received a note from testatrix requesting him to come and witness her will. He then phoned Mr. Brueseke's residence and told him to advise testatrix that he would accept. He came by later and took Mr. Brueseke to testatrix's residence. The will was in typewritten form and was on the table in testatrix's residence when the witnesses and Mr. Brueseke arrived. Testatrix greeted them, they were seated, and after a visit she told them that "on account of conditions she was making another will," "on account of changed conditions," and the will was executed. She did not say what the conditions were. Mr. Brueseke testified that he knew nothing about the will until Mr. Schindler called him. He further said: "I did not call him (Borrenphol), although he testified I did." No question is raised as to the formal execution of the will.

Appellants concede that "every witness who testified on the point

said they had no idea who drafted the will and nobody was able to say who did the typewriting," but appellants say that some of these witnesses "lied about it," and that the evidence shows they did know. We think the evidence referred to, however, was wholly insufficient to show prior knowledge of the will by any of the proponents. There was no evidence from which an inference could be drawn as to who prepared or typed the will, or as to the terms of any prior will.

For the last ten years of her life testatrix had "spells." Her arm would start hurting her, and then "it would go to her head" and she would have headaches, quite often. When she had headaches she would "take anything to relieve her." "She was pretty ailing for the last ten years." "She had had pains all her life." She had had rheumatism for many years and had suffered very badly the last few years. She was always holding her wrist and her suffering would show on her face. She would take aspirin tablets, sometimes 25 to 35 per day. When the pains struck her, she would grab her arm and scream with pain. The pain would continue "two hours to all day," and she thought it was neuritis pains. After 1933, "she wasn't to the point where she was a cripple and couldn't walk, no, but at times she would always say how she is suffering and she would grab a chair and say that the only things that fixed her up, maybe, were sedatives. . . . She used to always go to picture shows four or five times a day to forget about her pain and to get away from the heat in the summer; she was always spending her time in the picture show because she was in just such aching all the time." She also went to Hartman's Church and the cemetery. From around 1934 down to the time of her death "she was in very severe pain, she had that arthritis and it was in her arm, and she had very severe pain in her arm, and she continued to take sedatives." She attended "Truth Center" to have herself healed. She would try any medicine she was told about. From 1934 to 1936 "mentally she was all right, but physically she wasn't very good." "She was feeble and childish," "childish and old," old physically and mentally, "naturally, at her age." William Gaertner's wife, Laura, said testatrix was childish, "because she was always domineered and controlled by the Bruesekes and the Schoenbecks." The witness said she based the latter conclusion on a conversation, hereinafter set out, between Carl and testatrix in December, 1934, when witness was present. In the trial, contestants' attorney stated: "We are not even contending this lady was of unsound mind. . . . We are . . . saying she was feeble because of her age and physical condition." No issue was made as to testamentary incapacity, but it is contended that testatrix's mental and physical condition made her susceptible to fraud and undue influence.

The evidence as to fraud and undue influence turns about certain

conversations, some of them with and in the presence of testatrix. Testatrix's brother August H. Gaertner died April 1, 1933, and the newspaper published a news story referring to him as "an old pioneer contractor," not mentioning the fact that testatrix was his sister. The following day Walter Gaertner went to the home of testatrix. Carl M. Schoenbeck and Oliver F. W. Brueseke were there. Walter asked Oliver to serve as a pall bearer for his (Walter's) father, but Brueseke said he could not act, and he didn't. Thereupon, Carl, in the presence of testatrix, Oliver and Walter, said: "Well, that was a dirty trick of the Gaertners, to have an article in the papers where they didn't mention Aunt Hanna's (testatrix's) name, and Aunt Hanna, I always told you that they were ungrateful to you; that they never cared anything for you; they never wanted you around—I always told you that." Walter then said to Carl, "Carl, you shouldn't say a thing like that." Testatrix then said that "if she knew the Gaertners voluntarily would do a trick like that she would never forget it." The newspaper had made an error, and the following day had an article mentioning testatrix as a sister of August H. Gaertner.

In December, 1934, William Gaertner and his wife went to the home of testatrix to visit her. Carl and his sister Edna, and Edna's husband, Oliver, were there. William's wife, Laura, asked testatrix if Laura (Hahn) Hack had visited her recently and testatrix replied, "yes, Laura comes around about once a week." Thereupon Carl said, "Laura comes around once a week to check up on Aunt Hanna (testatrix) to see how long she is going to live so she would share some of the money." Laura Gaertner then replied: "Carl, I'm sure she doesn't talk that way." Edna then said: "The only parties that do care about Aunt Hanna are the Bruesekes and the Schoenbecks. . . . The Gaertners really have no love or affection for her (testatrix)." "Edna and Carl further said that Aunt Hanna understood that the Gaertners didn't care to be around her and didn't care to have her around them since she had gotten old and sickly." Laura Gaertner replied that "we love her just as much and we know that wasn't true." Testatrix said she "had heard that Walter had said she beat his father out of the inheritance." Laura and William then said they were sure that such a statement was never made. William asked testatrix from whom she got "that information" and testatrix answered, "from Ollie and Carl." She also said, "she got it from good authority." William asked them (Ollie and Carl) whom they "got it from" and they said they "preferred not to tell." When Mrs. Laura Gaertner told "Aunt Hanna" (testatrix) that the charge against Walter was not true, testatrix said, "Well I am not sure it isn't true, because when some of the relatives got a little money . . . the other relatives are anxious for them to die so they can share it." Laura told her that it was not so.

In the latter part of January, 1935, Walter visited his aunt (testa-

trix) and told her that she was "looking fine." She said, "Well, you may think so, but I haven't long to live." Walter said, "Oh, you have many more years to live." She said, "If I do, there will be many of my relatives sadly disappointed." Walter said, "No, you shouldn't feel that way." Testatrix then said, "I have heard a lot of bad stories about you boys. You, particularly, are claiming that I cheated your father out of his inheritance, and the rest of you boys were anxious for me to die so you could participate in my estate."

Walter asked testatrix: "Aunt, where did you hear that? Who told you that?" Testatrix replied, "Ollie and Carl told me." Carl was present, and Walter asked him, "Where did you hear that?" Carl said, "Ollie" (Oliver) "told me."

Walter testified that no such statement was ever made by him, because his aunt got her proportionate share of her father's estate, but "she just had a piece of property that was in a business neighborhood and it enhanced in value." He also denied that he had said he was "anxious for" testatrix to die so he "could participate in her estate." He denied that he had heard the matters mentioned, except as above.

Walter asked Oliver F. W. Brueseke (in the latter part of February, 1935), about these "falsehoods and rumors." Oliver replied, "Yes, I heard that and I was telling Aunt Hanna about that." Walter then told Oliver that it was a lie and charged that it was "being told her for no good purpose."

About the middle of March, 1935, on a visit to testatrix, and in the presence of Carl, Walter said to her: "Aunt Hanna, I saw Ollie about these rumors and falsehoods and he said he heard it, but refused to tell me who told him." Walter then told his aunt that he wanted her to know that the Gaertner boys had not made any such statements. His aunt replied, "Well, if it had not taken place, why is it being talked about?" Carl then said, "I don't care; you are hearing that these reports are made." Testatrix replied to this, "Well anyway, I have made my will," and Walter asked, "When did you make it?" and testatrix answered, "Well, Rudy and Ollie fixed it up, took me to Lawyer Nolde's office."

After the will was filed in December, 1937, Walter met Carl in downtown St. Louis and said to him, "Well, I can plainly see why so many falsehoods and rumors were told Aunt Hanna;" and referred to "the fact of how the will was made." Carl said, "I didn't have a thing to do with making the will," and added, "Ollie and Rudy fixed it up and took her to Lawyer Nolde's office." Walter didn't know at that time who "Lawyer Nolde" was. It is immaterial here that Carl, Edna and Oliver, her husband, denied that any such conversations took place, as related by Walter, William and Laura Gaertner.

Appellants called John H. Nolde (referred to above) as their wit-

ness. He had been practicing since about January, 1935, and he denied that he drafted the alleged will or knew testatrix in her lifetime.

William H. Gaertner testified he had never made any statements concerning any "cheating" of his father or a desire that testatrix die, or that she was living too long, or that he didn't like to be around her. On cross-examination he admitted that he. had made certain statements in his deposition. He testified as follows : " (By Mr. Beste) 'In your opinion, did anything like that happen, did she actually cheat your parents out of your share?' And wasn't your answer, 'Well, yes, sir, they had. Q. Mrs. Lindhorst had? A. Mrs. Lindhorst got the best, she and the Schoenbecks got the best of the deal. Q. In other words, in your opinion, she did cheat them? A. She certainly did.' A. Well, I didn't mean it in that way. Q. Did you answer that way? A. I meant that she got the best of the deal, the better piece of property. . . . I answered that way, but I didn't mean it in that way." In further explanation of this testimony he said: "There was no cheating of any kind done." "I just meant that my aunt got the better piece of property and got more money for it at that time."

With reference to testatrix's intentions, the evidence tended to show that, after August H. Gaertner's death (died in 1933), testatrix told an old acquaintance, in September, 1934, that "she was going to make a will and that she was going to will her brother's share to his children—the four boys." Emma Gaertner, sister-in-law of testatrix and the mother of the Gaertners, testified that testatrix told her "she was going to look out for my boys (Gaertners) because she owed it to them."

With reference to testatrix's attitude, the evidence tended to show that prior to December, 1934, the testatrix was on friendly terms, "very pleasant always," with the Gaertners. Their mother, Emma Gaertner, visited testatrix and attended picture shows with her, and was remembered by her in the will. Testatrix always received the Gaertners very hospitably. "She would serve wine, as a rule, and cookies," and ask about the relatives, but after 1934, the witnesses (Gaertners) described the conditions as follows: "Well, after that when we would go there, we were never left alone with her. Carl, Ollie, or Edna would be there or Mrs. Sublette would be there." "Well, she just didn't seem much interested in going into any conversation; she seemed to be cold. She just—the hospitality which formerly existed to us just wasn't there any more." "She just didn't seem to care a lot whether we came over there or not." "After 1934 she wasn't so friendly; didn't talk about the relatives so often."

The Mrs. Sublette, referred to, supra, came to live with testatrix as "housekeeper and companion on March 25, 1935. According to Mrs. Sublette, testatrix "wanted someone with her, she said,

and she felt like she had reached an age where she shouldn't be alone, and she needed someone to help her."

On one occasion, about the middle of March, 1935, William Gaertner asked "Aunt Hanna if her love was as much for her relatives and she said, 'No,' her attitude hadn't changed a bit." On this occasion testatrix told William and his wife that "Rudy and Ollie had fixed things up and took her to Lawyer Nolde to make her will." She further said: "I have got everything fixed up now." Mrs. Laura Gaertner testified that testatrix never seemed friendly after that, and that on subsequent visits by the Gaertners, "Carl or Oliver, insisted on making our visits short, because they said the Aunt wasn't feeling very good and she couldn't get excited very much." She further said: "We continued them (visits to testatrix) but they (Ollie, Edna and Carl) were always there and didn't care to have us around." "They held her confidence" and "she just thought that everything they told her was all right." In this connection, however, Walter testified that, "She (testatrix) never could stand company. In fact she would have a lot of people come in and . . . they would stay too long, she would tell them to go home. She couldn't stand it. . . . In fact they were always told (by the Bruesekes and Schoenbecks), when they were over there, not to stay too long."

At no time before or after 1934 did any witness ever hear testatrix utter one word of criticism against the Gaertners or the Hahns (except as above stated). There is no hint in the evidence of any other differences between testatrix and any of her nephews.

Walter visited testatrix on an average of once or twice a month and these visits continued after his father died in 1933. In 1937 after testatrix was bedfast, Walter took his wife and child to see testatrix. Textatrix told Carl to go downstairs and get a dollar for the baby, but he "objected" and didn't get it. Laura, wife of William Gaertner, said that they visited testatrix on an average of once a month until the time of her death.

Testatrix and her sister Fredericka Schoenbeck, inherited (from their father) adjoining properties, also referred to as being "one piece of property," and it is in effect conceded by contestants that testatrix and the Schoenbecks had always lived "pretty close together" and that at one time they had lived in adjoining yards. Contestants' evidence also shows that testatrix had much more contact with the Schoenbeck heirs than with the Gaertners, although she was said to be "very close" to the Gaertner boys. In this connection, the evidence further shows that Carl Schoenbeck's parents died prior to 1931 and, after testatrix's husband died in 1931, Carl moved to testatrix's home and continued to live with her until she died. He did not have outside employment after 1933, and "was always there." He was there more than his sister Edna. Laura Gaertner,

who visited testatrix approximately once a month for thirteen years, said: ''Well, to my recollection, the last years, you know, Edna, Carl or Ollie was always there, but previous to that time, they were there, too, but then we would see some others.''

The record contains no specific reference to William F. Hahn, Fred A. Hahn, Julius Hahn, Frank H. Gaertner, and Benjamin H. Gaertner, except as nephews and heirs at law of testatrix. Neither their residence or contacts with testatrix are shown. They did not appear as witnesses and their names were not otherwise specifically mentioned. None of them were mentioned in the will and the evidence attempts. no explanation for their exclusion from testatrix's bounty, except as above stated. Appellants' brief states that ''some of the Hahns lived in Chicago.''

Appellants insist that the evidence was sufficient to warrant the submission of the cause to a jury. They contend that an inference of fraud and undue influence could be drawn from the evidence in the record. Reference is made to authorities holding that fraud and undue influence need not be shown by direct proof, but may be inferred from facts and circumstances; that contestants are not required to produce direct evidence, either of fraud or undue influence, in order to entitle them to go to a jury; that it is proper to consider the mental condition of the person upon whom the influence is alleged to have been exerted, the circumstances connected ▮ with or bearing upon the execution of the will and the provision of the will itself; that, as a rule, undue influence is not proclaimed from the housetops, but is hidden like a light beneath a bushel and concealed like fraud and deception, only appearing through carelessness and unguarded openings; and that it is not required that the overt acts of undue influence be exerted at the exact time of the execution of the will, it being sufficient merely to show that such influence, over the mind of the testator, had been acquired previously and was in fact operative at the time the will was made.

▮ The burden of proof to establish fraud and undue influence was upon contestants (appellants). [Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S. W. (2d) 72, 85; Larkin v. Larkin (Mo.), 119 S. W. (2d) 351, 358; Gockel v. Gockel (Mo.), 66 S. W. (2d) 867, 870.]

▮ On the issue of fraud appellants say the will is the production of the fraudulent implantation in the mind of testatrix of false beliefs upon which she was induced to act and that this sort of fraud was sufficient to avoid the will procured by it, regardless of undue influence. Appellants rely particularly upon Spurr v. Spurr, 285 Mo. 163, 179, 226 S. W. 35, and Coldwell v. Coldwell (Mo.), 228 S. W. 95. The facts in these cases are much stronger than the facts here. In each of these cases there was substantial evidence that the testator was unable through weakness of mind and body to determine

the falsity of the statements and to resist the influence; and that the testator did rely and act upon the false statements rather than upon other motives and inducements. For example in the Spurr case, supra, the court said:

"They (contestants) introduced evidence tending to show that the defendant, Jane Morse, nee Spurr, told the testator that his sister, Mrs. Estes, had no affection for him, that she had complained of the trouble and annoyance he caused her while sick at her home, that she had turned him out, and that she had replied to an inquiry concerning him, 'He is not dead yet,' thereby implying a hope on her part that he would soon die; that these statements were also made by the defendant, Louis Morse, to the testator's intimate friends in St. Louis, with the expectation that they would repeat them to him and commiserate with him on the heartlessness and ingratitude of his sister, as they in fact did; that these statements were wholly false and known so to be by Jane Spurr at least; that they were made by her in an effort to monopolize the affections of the testator to the exclusion of his sister, who had theretofore been his favorite, for the manifest purpose of depriving the latter of any share in the testator's estate and of securing a corresponding advantage for herself; that the testator whose natural egoism had been intensified by the nature and duration of his illness readily believed the false statements and acted on them, as Jane Spurr had intended that he should, with the will in question as the result. These facts, if established, would constitute such fraud as would avoid the will."

The charge of fraud made against Carl, Edna and Oliver in the petition was that while occupying a confidential fiduciary relationship to testatrix they entered into a conspiracy and made certain false statements to her; that the statements were false and known to be false; that they were made with intent to deceive testatrix thereby; that she believed said statements to be true; that she relied thereon and was deceived thereby; that she executed the alleged will in reliance upon said statements; and that thereby appellants were totally excluded from the will to their injury and damage.

Appellants contend that the evidence was sufficient to show that as early "as the fall of 1934" testatrix intended to give the Gaertner nephews "their father's part of her estate;" that "respondents pressed upon testatrix false charges as to misconduct by the Gaertners and Hahns of a character extremely offensive to testatrix and which were intended to and did make her believe in the truth of those false charges;" that she did believe the charges, because Carl and the Bruesekes "held her confidence" and "what they told her she thought was all right" (mere conclusions of witness Laura Gaertner, not supported by facts in the record); and the "charges against appellants" were "absolutely false" and admitted to be false by Carl; that since "respondents did deny making the charges to testatrix

during conversations with the Gaertners in the presence of testatrix, . . . the issue was simply one as to the veracity of the witnesses (and for the jury); that the respondents Carl, Edna and Oliver never permitted the Gaertners ▮▮ to be alone with the testatrix after she disclosed to the Gaertners, in respondents' presence, the charges the latter were making against the Gaertners;'' that ''soon after the time the respondents made the accusations in question against appellants, testatrix changed her attitude, entirely, toward the Gaertners, particularly, and never departed from that change;'' that the ''changed conditions'' requiring a new will, could not, under the record, have been anything other than ''the change of feelings of testatrix engendered by the false charges respondents made to her against the appellants;'' and that as a direct result of said false charges a new will was made and appellants were totally excluded to their damage.

The argument assumes there was a prior will and assumes that provision was made therein for legacies to appellants. There was no evidence of the content of any prior will. There was no evidence from which a conspiracy could have been inferred, and no evidence of a ''confidential fiduciary relationship.'' The evidence of change of attitude, in view of testatrix's age and admitted physical condition, was very meager. She quit serving cookies and wine. She didn't talk about the relatives so often. She ''seemed'' cold, didn't ''seem to care a lot,'' never ''seemed'' friendly, didn't ''seem'' much interested in going into conversation, the ''hospitality'' which formerly existed wasn't there, and somebody was always present when the Gaertners visited. It is admitted that testatrix at no time before or after the alleged conversations, had any other differences with the Hahns or Gaertners and there is no evidence of any criticism of them by her except as herein stated. There was no evidence from which an inference could be drawn that by the statements, ''on account of conditions'' or ''changed conditions,'' the testatrix referred to a ''change of feelings'' toward appellants.

There was no substantial evidence that testatrix (in the making of her will) relied upon the alleged false statements and was deceived thereby and for that reason excluded appellants. Most of the alleged conversations concerned the Gaertners, and particularly Walter Gaertner, but all of the Gaertner and Hahn nephews were omitted. On the other hand, appellants' own evidence offers an explanation of the terms of the will on a basis other than fraud and undue influence, to-wit, that the Schoenbeck children had had much more contact with testatrix over a period of years than the Gaertners. There was no substantial evidence that the alleged statements caused testatrix to make any different disposition of her property than she would otherwise have made. The prior ''declarations'' of testatrix to the mother of the Gaertner boys that she was going to ''look out'' for them, and

the statement about their father's part of her estate, do not amount to substantial evidence of a change of disposition of her property. The evidence fails to support the charge that the will was procured by fraud.

Appellants say "the conversations and controversies between respondents and appellants in which testatrix participated" were "not only competent to show 'state of mind,' but also to show admissions of respondents and actual efforts to prejudice testatrix against appellants." Appellants say, "The admission of the so-called 'declarations' was justified for numerous reasons," referring to 79 A. L. R. 1447 et seq. The admission of this evidence is not an issue here, if it was, some of the evidence might have been excluded since "an extrajudicial admission made by one of several legatees or devisees is not admissible in a will contest." [Look v. French, 346 Mo. 972, 144 S. W. (2d) 123, 131.]

Early in the trial a question arose as to a statement made by the testatrix, to-wit, that "Aunt Hanna told me she kept him (Carl) up," being hearsay. On objection being made that the statement was purely hearsay and should be excluded, counsel for contestants stated, "The evidence of the deceased in a will contest is admissible for the purpose of showing a state or condition of the person's mind with reference to any of the issues of undue influence. It is not admissible for the purpose of showing facts . . . I think it will be quite in order at the conclusion of the case for the court to give the jury an instruction that for the purpose of showing the proof of the facts, those statements are not admissible, but for the purpose of showing a state of mind they are admissible." After this statement by counsel no further objections were made to the admission in evidence of statements alleged to have been made by testatrix. Appellants here insist that these declarations were sufficient to make issues for the jury as to the matters of fact set forth in the declarations, to-wit: as to the existence of a prior will; as to changing her will; as to ▮▮▮ who prepared the will and cooperated in its preparation; as to who told her certain things; and to other matters. The cause was not tried below on that theory.

On the issues of fraud and undue influence appellants contend there was ample evidence of "impaired mentality and susceptibility to domination." In the trial of the cause counsel for contestants expressly stated they were "not even contending" that testatrix was of unsound mind, only that "she was feeble because of her age and physical condition." The evidence fails to disclose any "impaired mentality." The evidence particularly emphasized as supporting "susceptibility to domination" is the statement of witness Laura Gaertner in support of her statement that testatrix was "childish," "because she was always domineered and controlled by the Bruesekes and the Schoenbecks." This conclusion of the witness was admittedly

based upon the witness's reaction to the conversation had in her presence in December, 1934. Other evidence particularly pointed out is the fact that proponents' witness, Mrs. Thoms, on cross-examination, admitted she had previously testified by deposition that when testatrix "was in great pain, toward the last few years of her life, you could do about anything with her. She had great will power, but her pain would cause her great suffering." The witness explained this testimony by saying, "I meant when she was in great pain, if anybody told her anything she could do or take or anything, then she would try it, but you could never influence her." Appellants say the "written statement of Mattie Thoms . . . was competent and constituted substantive evidence of the facts stated," citing Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400, 410. There was no evidence with reference to testatrix's particular physical condition or pain at the time of any of the conversations mentioned in evidence or at the time the will was prepared or executed. The evidence favorable to contestants has been fully set forth herein and we find no substantial evidence of either "impaired mentality" or "susceptibility to domination."

Appellants say, "the cultivation of testatrix by respondents, their exclusion of appellants from private conversations with testatrix, the proof of her belief and confidence in them and her trust in them as to the very matter of 'changing' her will, their falsehoods told to her relating to appellants, her announced belief in their truth, Oliver Brueseke's procuring the witnesses and then denying it, his presence when the will was signed, the kinship of the witnesses to the will, respondent Oliver's knowledge that the will was typewritten when the jury was justified in finding that he did not see the will at the time of its signing and his denial of ever having heard of it before, the absence of any cause for the new will save respondents' slanders of appellants, and other like things, were more than sufficient proof of undue influence and fraud."

There is no substantial evidence of *exclusion* by respondents of appellants from private conversations with testatrix. There was evidence that Carl or Mrs. Sublette, who lived with the testatrix, were always there and usually Edna and her husband, but no evidence of intentional *exclusion* of appellants from private conversations. There was only hearsay evidence that "Rudy and Ollie" fixed up the will, or took her to "Lawyer Nolde." There was no evidence of testatrix's "trust in them (respondents) as to the very matter of 'changing her will.'" The fact that Mr. Borrenphol was under the "impression" that Oliver Brueseke called him to witness the will, together with the other facts in the record would not support an inference that Oliver Brueseke exercised undue influence to procure the will. Neither will the evidence support an inference of undue influence by Carl Schoenbeck or Edna (Schoenbeck) Brueseke.

There was no evidence in this record that Carl, Edna or Oliver ever talked to testatrix about making a will or suggested or directed the disposition of her property or to whom it should be given or unduly influenced her in the making of her will. We have carefully considered the record in this case and the many authorities cited by appellants and are unable to find any case which has been submitted to a jury on such limited evidence as is shown in this record.

"Proof of influence alone is not sufficient to break a will. It must be undue influence. Turner v. Anderson, . . . 236 Mo. l. c. 541, 139 S. W. l. c. 185, whereat the court says: 'Undue influence to be effective in breaking a will should be of sufficient potency to destroy the free agency of testator at the time of making the will. The influence of natural affection is not sufficient, for natural affection may flow at all times, and its waters ▇▇▇▇ are under no ban known to the law. The undue influence that will break a will must be present, in active exercise, and rise to the mark of such over-persuasion, coercion, force, fraud, or deception as breaks the will power of testator and puts in its stead the will of another.' " [Larkin v. Larkin (Mo.), 119 S. W. 351, 358; Webster v. Leiman, 328 Mo. 1232, 44 S. W. (2d) 40, 43, 45.] "There must be more shown than 'mere opportunity to influence' or 'mere suspicion.' " [Rex v. Masonic Home of Missouri, 341 Mo. 589, 108 S. W. (2d) 72, 86; Teckenbrock v. McLaughlin, 209 Mo. 533, 551, 108 S. W. 46, 51.]

Considering the evidence upon the same theory upon which the cause was tried and giving plaintiffs the benefit of all favorable inferences that may be drawn from the whole evidence, we think the demurrer to the evidence was properly sustained.

Error is assigned on the exclusion of "appellants' offer to prove" by proponent Edna Brueseke, that she "and her brothers deliberately conceived and set up the plan to poison the mind of testatrix against appellants." No authorities are cited. The matter was sufficiently covered by later cross-examination of the witness by appellants' attorney and appellants were unable to make the proof to support the offering. The assignment is overruled.

The judgment is affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.