# OCTOBER TERM, 1939.

Mary Winn and Israel T. Matthews, Appellants, v. John W. Matthews, and Joseph G. Matthews, Respondents.—137 S. W. (2d) 632.

Kansas City Court of Appeals.   January 1, 1940.

*W. L. Hamrick, Drain & Osborne* and *C. G. Buster* for respondents.

*Ed S. Jones, George N. Davis* and *Waldo Edwards* for appellants.

SPERRY, C.—This is a will contest case. Judgment was in favor of the validity of the will, and contestants appeal.

Mary E. Matthews, hereinafter referred to as testatrix, died in 1936, at the age of 86 years. She had separated from her husband, the father of the parties herein, who were her children, some forty-five years prior to her death. This suit was brought by Israel T. Matthews and Mary Winn; and John and Joseph G. Matthews are made defendants. At the time of her separation Mary Winn was married and living in a home of her own; Israel T. Matthews, known in the record as Ed, went with his father; and Joel, known in the record as Joseph G., or Joe, and John went with testatrix. John lived with his mother constantly from the time of her separation from his father until her death. She had been totally blind during the last eighteen years of her life, and drew a blind pension. About four years prior to her death she suffered a broken hip, and thereafter never left the house and was unable to wait on herself. Joel disappeared, some fifteen years prior to her death, and his whereabouts from that time onward remained unknown.

John had lived with his mother throughout her life, waited on her, slept in the same room with her, and transacted some business for his mother.

Ed and Mary Winn had homes in the same general community where their mother lived. Until October, 1934, they were more or less frequent visitors at her home, and the relationship between the various members of the family was friendly. At the time of her death, and for many years prior thereto, testatrix and John had lived on a 60 acre farm which she had acquired through inheritance from her husband. Upon the income from it, together with the proceeds of her blind pension, she and John had lived. During the last four years of her life, after her hip was broken, they had kept a girl to do the housework.

When testatrix suffered a broken hip she became, and remained, practically helpless. She was blind and otherwise in bad health, in addition to her crippled condition. At that time John sought Ed and suggested that he, John, was unable to look after his mother without help. Ed agreed to assist John provided that testatrix deed Ed thirty acres of the farm, to which John agreed. They agreed on the particular land to be deeded but when the matter was finally submitted to

testatrix she refused to agree thereto, or to execute a deed, whereupon the matter was abandoned and John continued to care for his mother as before. Ed and his family continued to visit testatrix from time to time, and to do kindly and affectionate services for her, until about October 9, 1934.

Testatrix was forgetful, would send for Ed and when he got there would tell him she had forgotten what she wanted to ask him. She was rather contentious and selfwilled. She would refuse to change her clothing for days at a time, and would sleep in the same clothing that she wore in daytime, until she became very dirty. She would inquire of others as to the character of various girls who worked at her home and would, on occasion, insist on one being discharged. She protested the presence of one girl employed by her when she learned that John was about to marry her. She insisted that she leave the place and, after a long argument, John agreed that the girl should leave; but during the night testatrix relented, she and John became reconciled, the girl remained and she and John were later married.

There was no medical evidence tending to prove testatrix was of unsound mind. Nor was there any direct testimony from lay witnesses to that effect. All of the direct evidence on the point was to the effect that testatrix, at the time the will in question was executed, was in as good mental condition as any average person of that age. There was positive direct testimony to the effect that testatrix, shortly after the will was made, expressed her disapproval of the conduct of Ed and his family, and of Mary Winn, regarding their suit in probate court, filed on October 9, 1934, wherein it was sought to have testatrix declared to be a person of unsound mind. Such suit was later dismissed.

The will here being adjudicated was executed on October 9, 1934. The uncontradicted testimony in connection with the actual execution of the instrument is as follows:

Testatrix had a bachelor brother, Will Gee, who died about October 4th or 5th, 1934. About $30,000 was left to testatrix by his will, which will was read to testatrix on or about October 7, 1934. The next day thereafter Ed informed John that someone should be appointed, or agreed upon, to look after this property, because, as he said, each of the children of testatrix would want their share. To this suggestion John replied that before Mary Winn should have any of the money he, John, would put it in circulation. On October 9th, at about 11 A. M., John accompanied Mr. Hamrick, a lawyer, together with Dr. Harlan, testatrix' attending physician, and a Mr. Dorrell, a business man, all residents of Clarence, the town near which testatrix resided and where her business was transacted, to the home of testatrix. Dr. Harlan testified that, after their arrival, he visited for some minutes with testatrix, in the presence of the others, and that Mr. Hamrick then read to testatrix the instrument in question, which

purported to be the last will of testatrix, and asked her if she understood it; that Hamrick read it twice, and asked her if any influence was being exerted over her in connection with the making of the will; that she replied "No;" that testatrix then signed name, by her mark, and requested that witness and Dorrell sign same as witnesses; and that Velma Cochrane, who was present, also signed as a witness. Dorrell testified to about the same facts as above detailed. Both witnesses testified that, in their opinion, testatrix was of sound mind; that testatrix stated in their presence that she understood the document and that it was as she desired it to be. Dr. Harlan stated that the condition of testatrix' mind was as good as it had ever been since he had known her, and that he had been her physician, had regularly called on her and treated her for some seven years prior to this date.

Velma Cochrane testified that she witnessed the will and that John Matthews was present when it was executed. Her testimony otherwise, while not in such detail as that of the other witnesses mentioned, was not contradictory of the testimony of Dorrell and Harlan.

It was established that testatrix, after execution of the will and on the same day and occasion, executed a power of attorney whereby John was given complete control over all of testatrix' property from that day forward. He received all of the property devised to his mother under the will of her brother.

Under the terms of his mother's will John received all of her property, her other children being nominal beneficiaries only. After testatrix died, September 6, 1936, the inventory of her estate, as filed in probate court, revealed that her sole estate consisted of personal property of the value of $348.00.

The evidence was to the effect that after the filing of the charges of mental incompetency of testatrix by Ed Matthews and Mary Winn, and the execution of the will in controversy, neither Ed nor Mary Winn were ever permitted by John to come into the house to see their mother; and there was evidence, offered by contestants, to the effect that testatrix expressed resentment toward Ed and Mary because of the filing of the probate charges. It also appears in the record that there was some litigation over the will of Will Gee, and that the same attorneys here representing John Matthews, the proponent of the will, represented testatrix in that litigation.

Contestants challenged the validity of the will on two grounds: First, that it is not the will of testatrix because she, at the time it was executed, was mentally incapable of making a valid will; and, second, that the will is the result of undue influence exerted over the mind of testatrix by John Matthews. At the conclusion of all of the evidence the court directed a verdict declaring the will to be the last will and testament of testatrix. Contestants have appealed and urge here that both of the above questions, were questions for the jury.

On the question of the mental capacity required of a testator to make a valid will the courts have spoken as follows: Testator must be mentally capable of understanding the nature of the transaction he is engaged in, that is, disposing of his property to take effect at his death, the general nature and extent of his property, (but need not be able, at the instant, to recall to mind the various items that compose his estate, or the names of his various creditors with the amounts owed each), the natural objects of his bounty, and to whom he desires to give it. [Hall v. Mercantile Trust Co., 59 S. W. (2d) 664, 1. c. 669; Carl v. Ellis, 110 S. W. (2d), 805, 1. c. 807, 808; Pulitzer v. Chapman, 85 S. W. (2d) 400, 1. c. 414.] Measured by this rule we think the evidence establishes that testatrix was mentally capable of making a will. She knew her four children and talked of them to many witnesses who testified in this hearing, none of whom stated that they thought she was mentally deficient. She was asked about the will at the time it was executed, and said she approved of it; and no witness, by his or her testimony, raised any question as to her knowledge of the character and import of the transaction. There was strong positive evidence to the effect that she was then as mentally sound as she had been during the past seven years. She knew of the general character of her property because the will of Will Gee had been read to her previously and she had discussed it in detail with Mary Winn, one of contestants. On the 9th of October, 1934, the day this will was executed, contestants filed a complaint charging that testatrix was mentally incapable of managing her affairs. Thereafter this complaint was dismissed; and neither contestant offered to testify that they believed their mother to be mentally incapable of making a will. The court was fully justified in taking this issue from the jury.

On the question of undue influence, which was also taken from the jury by the court, it is the contentions of contestants that a confidential relationship existed between testatrix and John, that John was the sole beneficiary of the will, and that he was active in procuring its execution. If there was substantial evidence tending to establish each of the above premises, as they have been defined by judicial opinion, then the question of undue influence was one for the jury; and if the evidence on each of said propositions was conclusive, or if the jury had, by verdict, established their truth, then the will is invalid because of undue influence. [28 R. C. L., 146, 147; Minturn v. Conception Abbey, 61 S. W. (2d) 352, 1. c. 361.] Before any presumption of undue influence arises there must be a devise in favor of a beneficiary who is in a fiduciary relationship toward testator, accompanied by substantial evidence to the effect that he had opportunity to exercise undue influence, *and that such influence was in fact exerted.* [Minturn v. Conception Abbey, *supra*, 1. c. 361.]

The record in this case fails to establish a confidential relationship existing between John and his mother, as the same has been defined by the courts. It is but natural that there should have been a strong bond of affection between them, because John remained with testatrix as her sole companion, and refrained from marrying until he was past 60. He slept in her room and ministered to her. But the uncontradicted testimony was to the effect that she advised with Ed, as well as John, prior to their estrangement, regarding business affairs. She refused to deed land to Ed when John and Ed joined in requesting her to do so. Hired girls were discharged upon her insistence, over the protests of John. She ordered the girl, who later became John's wife, to leave the house when she learned that she and John were engaged, and it was only after a day or two of contention, during which time she talked with the neighbors about the matter, that she finally assented to her remaining. The testimony was that testatrix would tell John what she wanted in the way of groceries and that John would get them. The evidence fails to prove that John told testatrix how to dispose of her property, and fails to establish that she would have been likely to do his bidding in the matter if he had told her. The fact that her affection for him as over the other children led her to favor him to their exclusion, is no reason, standing alone, for a court or jury to make a will for her contrary to the one she made. [Campbell v. Carlisle, 162 Mo. 634, l. c. 646.]

It may be said that since John invited and brought the parties to witness the will that such activity was evidence of undue influence. But there is no evidence tending to show that in doing so he was acting in any capacity other than as a messenger for his blind and crippled mother. [Campbell v. Carlisle, *supra*, l. c. 647.] While undue influence may be inferred from evidence which, of itself, does not directly prove it, yet there must be evidence from which such a reasonable inference may be drawn. [Doherty v. Gilmore, 136 Mo. 414, l. c. 419.] There is no word of direct evidence tending to prove the charge; nor do all of the circumstances proved give rise to such an inference. [Doherty v. Gilmore, *supra*.] The most that can be said of the evidence in this regard is that there may be a suspicion of undue influence; but suspicion is not enough to support an inference. There must be some substantial evidence tending to establish the charge, and the burden is on contestant to offer such evidence. [Minturn v. Conception Abbey, *supra*; Rex v. Masonic Home of Missouri, 108 S. W. (2d) 72, l. c. 86.]

In the absence of any substantial evidence to substantiate either the charge of mental incapacity, or that of undue influence, there was nothing for the jury to pass on; and the trial court properly directed a verdict. [Campbell v. St. Louis Union Trust Company, 124 S. W.

(2d) 1068, l. c. 1070; Williams v. Lack, 328 Mo. 32, l. c. 36; Nute v. Fry, 111 S. W. (2d) 84, l. c. 88.]

The judgment is affirmed. *Campbell, C.*, concurs.

PER CURIAM:—The foregoing opinion of Sperry, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.