REBA SNELL and OMER SUMMERS, Respondents, v. JOSEPH E. SEEK and JOSEPH E. SEEK, Executor, Estate of DAMARIS SUMMERS SEEK, Appellants, No. 42875—250 S. W. (2d) 336.

Division One, July 14, 1952.

*Wherritt & Sevier, Alan F. Wherritt* and *Robert F. Sevier* for appellants.

*Francis G. Hale, Robert E. Coleberd* and *Arthur R. Kincaid* for respondents; *Lawson, Hale & Coleberd* of counsel.

 COIL, C.—Plaintiffs-respondents, adopted children of Damaris Summers Seek, contested her will. They alleged both mental incapacity and undue influence upon testatrix by her husband, Joseph E. Seek. The purported will bequeathed $1,000 to each of the two adopted children, with the residue to the husband. The value of the estate, shown by an inventory, was approximately $38,000. Defendant Seek, individually and as executor, has appealed from a judgment entered on the verdict of the jury finding against the will.

██ At the close of plaintiffs' (contestants') case, the court withdrew the issue of mental incapacity. The cause was submitted on undue influence. Defendant (proponent) here contends that plaintiffs failed to make a submissible case on that issue. In determining whether there was sufficient evidence to make a submissible case on that issue, we accept contestants' evidence as true, disregard proponent's evidence except as it aids contestants, and afford contestants all favorable inferences which reasonably may be drawn from the whole evidence. But we consider contestants' evidence in its entirety and isolated parts thereof only in their proper relation to the whole of contestants' evidence. Walter v. Alt, 348 Mo. 53, 67, 152 S.W. 2d 135, 142; Hahn v. Brueseke, 348 Mo. 708, 713, 155 S.W. 2d 98, 100.

Prior to her marriage to defendant Seek, testatrix was the wife of John Summers, a farmer and onetime county judge who, with testatrix, had resided on a farm east of Excelsior Springs, and who died possessed of considerable farm acreage. Shortly after 1901, Mr. and Mrs. Summers adopted two small children, Reba and Omer (contestants), both of whom lived in the Summers home as adopted children until their respective marriages. Mr. Summers died in 1939 and, apparently, by his will devised about 160 acres of Texas land jointly to his adopted children, Reba Snell and Omer E. Summers, and left the residue of his estate to his widow. About two years later, in 1941, Mrs. Summers married Seek. The Seeks lived together until her death in June 1950. She was then 83 and Seek was 73. Prior to and at the time of his marriage, Seek was a minister in the Christian Union Church and at times had been also a coal [338] miner, paper hanger, and painter. He had been pastor of churches near Excelsior Springs and, although partially retired, continued active in church affairs to the time of trial.

The only evidence pertaining to the execution of the will was adduced by proponents. On June 17, 1949, Mr. Seek appeared at the office of Richard E. Moore, a lawyer in Excelsior Springs, and handed to him some "handwritten notes." Mr. Moore was not acquainted with either Mr. or Mrs. Seek. Seek told Moore than his wife wanted a will prepared from the notes. To Moore's inquiry as to why Mrs. Seek was not present, Seek replied that her health was bad and that she wanted the will written and brought to her house to be signed. Mr. Moore agreed to have the will prepared by the next morning

and suggested that "they" have witnesses present at the home so the will could be properly signed. Mr. Moore drew the will from the notes. He said they were in the form of a will and that he needed to do little more than have the proposed will typed. The next morning, Seek called Moore and advised him that the witnesses were at the home and requested that Moore bring the will for signature. Mr. Moore took the will to the home. In the front room with Seek were a Mr. Holman and a Mr. Cooper. Mrs. Seek was in a bedroom "propped up in bed." Moore informed the others that he wished to talk with Mrs. Seek privately. He went into the bedroom and there talked generally with her for a few moments, read to her the proposed will, and explained the meaning of its provisions. He told her: " 'Now, Mrs. Seek, you realize that by this will you're giving one thousand dollars to each of your adopted children; that you're giving the balance of your estate to your husband, and that you're further providing that in the event anyone contests this will unsuccessfully they shall receive nothing?' She said, 'Yes, that's what I understand.' And I said, 'Now, is this what you want?' She says 'Yes, that's the way I want my will drawn.' " Mr. Moore was satisfied that the will corresponded to her wishes. He called in Holman and Cooper who, together with Mr. Moore, witnessed the will after it had been signed by Mrs. Seek. Moore was satisfied that Mrs. Seek was of sound mind. Seek did not say or do anything at the time in the nature of any direction or suggestion concerning the execution of the will. Moore thought he took the will and delivered it to the bank to be put in Mrs. Seek's safe-deposit box, but he may have left it at the home. In any event, he knew that the will was placed in the safe-deposit box to which both Mr. and Mrs. Seek had access. Mr. Moore had not preserved the notes and did not know in whose handwriting they were.

Holman and Cooper were present in response to Seek's telephone requests to appear and assist in a business matter. Both were well acquainted with the Seeks. Holman was a minister in the Christian Union Church; he had been the pastor at Excelsior Springs from 1945 to 1949. Cooper was a first elder in the same church. Both testified as to the due execution of the will by Mrs. Seek and their attestation. In their opinions she was of sound mind at the time. Both said that Seek had never discussed the will with them.

Mrs. Seek was quite active in affairs of the same church and had taught a Sunday School class for a number of years prior to June 1946. At least after June 1946 Mrs. Seek was not in good health. While, as noted, lack of testamentary capacity was not submitted to the jury, nevertheless, the physical and mental condition of the testatrix at the time of the execution of the will is important on the issue of undue influence. There was no direct evidence as to her physical and mental condition on the day the will was executed other

than that she was "propped up in bed" and the opinions of Moore, Holman, and Cooper that she was of sound mind.

Contestants' evidence as to Mrs. Seek's physical and mental condition was directed chiefly to the period 1946 to 1950. During this period, Mrs. Seek was "up and down." She usually dressed in the morning, but spent much time lying down. A neighbor, Mrs. Kiley, said that sometimes Mrs. Seek was in bed and at other times she was going about her household duties. Nina Edmonston testified that, on occasions when she visited at the home of testatrix, Mrs. Seek [339] would wonder why she hadn't heard from Reba, then later during the visit Mrs. Seek would display a letter from Reba which had been received that same day; that once (no date given) Mrs. Seek failed to recognize witness when they were both patients in an Excelsior Springs clinic. Mrs. Parsons, who stayed at the Seek home when Seek was away, said that on one occasion in 1948, Mrs. Seek took a bottle of nerve medicine and began to drink it and that witness took it away from her, and that Mrs. Seek then ran outdoors and had to be brought back by the witness. She also said that Mrs. Seek was forgetful but was unable to give any instance upon which she based the conclusion. Mrs. Gladys Summers, one of the proponent's witnesses, said that Mrs. Seek would repeat things at times. Ezra O'Dell, who had known Mrs. Seek for 30 years and who operated the Summers "home place" after Summers' death, testified that Mrs. Seek's mind was not what could be called sound because it was "like all old people's, it (was) wavy." He apparently based this statement solely on the fact that, in his opinion, Mrs. Seek couldn't keep the "settlement" figures straight and would call in Seek to make the "settlements" (hereinafter discussed) and to write the checks. However, O'Dell agreed with all of the other witnesses (both contestants' and proponent's) who testified on the subject, that Mrs. Seek was a strong-minded, strong-willed, independent, opinionated person; that she knew her own mind and knew what she wanted to do. All the witnesses who expressed an opinion, except O'Dell to the extent noted, were of the opinion that Mrs. Seek was of sound mind. One witness testified that late in 1948 or early in 1949 Seek told her that Mrs. Seek's mind was "bad" and that she was growing weaker. Another said that Dr. Whitesell, the attending physician, some time during the two years prior to Mrs. Seek's death, told the witness that Mrs. Seek was some days fine, others not, that "it's so much right here", touching his head. Another witness testified that in April 1949, Dr. Whitesell told her there wasn't anything seriously wrong with Mrs. Seek; "it was her age, her mind." Dr. Whitesell, testifying for proponent, denied having made either statement. Some of contestants' witnesses testified that on their visits to Mrs. Seek she talked about her farms, what her husband was doing, and discussed current events; that she was a fluent conversationalist; that she was

intensely religious. O'Dell testified that she discussed with him farm matters, what was going to be done, and the sale of livestock. Mrs. Seek wrote all her own letters and wrote many.

From June 21, 1948 to June 12, 1950, Mrs. Seek had been in an Excelsior Springs clinic a total of fifteen times for durations of five or six days to a month, these visits totaling 256 days. The only medical evidence was adduced by proponents. To present the complete picture and to emphasize that there was no medical evidence to the contrary, we note that Dr. Whitesell, an osteopathic physician and superintendent of the clinic, testified on behalf of proponent that he was Mrs. Seek's sole doctor between the latter part of 1943 and her death in 1950; that her condition of poor health was due to a chronic ailment in the nature of a gastrointestinal disorder including a gall bladder condition and a very ''spastic irritated colon'', and that there were some rheumatic tendencies. In his opinion, Mrs. Seek was a very strong-willed and independently-minded person.

Mrs. Seek was especially fond of Reba and Omer, and of her grandchild, Dee, the daughter of Omer. She often talked with visitors about them and proudly displayed their pictures. She corresponded with her children regularly. Reba, who lived in California, visited Mrs. Seek on probably three occasions during testatrix' illness. Omer, who also lived outside Missouri, visited Mrs. Seek at least once during her period of illness. Mrs. Parsons testified that she heard Mrs. Seek say that Dee would be well provided for and that Mr. Seek had made a will in which he had remembered Dee; that Mrs. Seek had learned that Omer and Reba had struck oil on the Texas land devised to them by Mr. Summers.

All of the evidence was that the husband-wife relationship between the Seeks was marked by mutual love and affection. Witnesses testi-fied that, on numerous visits to [340] the home, they had never heard cross words; that Seek took exceptionally good care of Mrs. Seek; that Mrs. Seek expressed herself as thinking ''a great deal'' of him; that they displayed the usual affection of husband and wife; that there was never any indication that Mrs. Seek was afraid of Seek; nor had they ever heard him giving any orders. Some, who had visited in the home at times when Seek was not present, testified that this same attitude of affection of Mrs. Seek for her husband was displayed in his absence. Reba was quoted as heartily approving her adopted mother's marriage to Mr. Seek. All witnesses who testified concerning the matter, stated that they had never heard Seek say anything of a derogatory nature about Reba, Omer, or the grandchild, Dee.

Contestants' witness O'Dell testified that he had worked for John Summers for about a year prior to his death and that thereafter, and prior to her marriage to Seek, he entered into a written partnership agreement with Mrs. Seek. This agreement, not introduced in

evidence, was apparently an equal partnership arrangement for the operation of the 216-acre Summers "home place." O'Dell said that every two or three months he would go to the Seek home with a list of expenses which he had incurred; that at first Mrs. Seek and later Seek, at the direction of Mrs. Seek, went over the figures and arrived at the amount which was due O'Dell or, apparently in some rare instances, due from O'Dell to Mrs. Seek. These acts are referred to in evidence as "settlements." Contestants' evidence demonstrates, however, that these "settlements" consisted only of an adjustment or division of the expenses; that the main farm operation was raising and selling cattle; and division of the proceeds of cattle sales was not involved in the "settlements." (Apparently, O'Dell paid Mrs. Seek her half of such proceeds as they were received). O'Dell said that the reason Mrs. Seek directed Seek to make these "settlements" was that she couldn't get the figures right; that she told Seek to write the checks; that she and O'Dell signed jointly the partnership income tax returns which were prepared by someone other than Seek. While Seek did some roofing and painting on the farm buildings, he took no part in running the farm; he simply wrote the checks on a joint account to equalize the farm expenses and, in each instance, such were in the proper amounts. Portions of Seek's deposition were read in which he stated that he had looked after the partnership business from the time he and Mrs. Seek were married. So far as the evidence disclosed, however, the partnership business referred to was nothing more than these "settlements."

Contestants' evidence also showed that O'Dell occupied the 216-acre "home place." The inventories in Mrs. Seek's probate estate indicated that Mrs. Seek owned at the time of her death farm lands totaling 663 acres. There was no evidence whatever as to the management or operation of the farm or farms other than the "home place", except as proponent's witness Hull testified that he generally advised Mrs. Seek in her business affairs.

Beginning sometime in 1946, Mrs. Seek's individual bank account was changed at her direction to a joint account, and checks thereon could be signed either by Mr. or Mrs. Seek. Of 285 checks on this joint account, all were signed by Seek with the exception of four signed by Mrs. Seek. These checks were referred to and inquired about in contestants' case and were introduced in evidence by proponent. An examination of them discloses that with the exception of one, to be hereafter noted, the checks generally were for expenses which a husband and wife incur in the operation and conduct of a household. Many of the checks were to the Mitchell Clinic for expenses incurred during Mrs. Seek's visits there. Some of the checks were for taxes. Others consisted of withdrawal slips (counter checks) for cash, usually in the amount of $25 or $50. Others were for insurance premiums. Some were to the partner O'Dell. There is nothing

about these checks which, from an examination of them or from any testimony concerning them, can be said to indicate that any improper use was made of the joint account by Seek.

One check signed by Seek was dated May 17, 1950, for about $1400, and was payable to a savings and loan association. Contestants' [341] evidence was that this check was signed by Seek at Mrs. Seek's direction. Jewell Summers, Mrs. Seek's nephew, had been ill for a long time. Prior to his death in April 1950, Mrs. Seek had talked with him and his wife, Bernice, about their financial condition and had agreed to pay the indebtedness due on their home. The check, not written until after Jewell's death, was written at Mrs. Seek's specific direction. No note was given by Bernice, Mrs. Seek saying "We'll take care of that later." In October 1950, Bernice Summers and defendant Joseph Seek were married.

In his deposition, Seek stated that Mrs. Seek had great confidence in him and thought that whatever he did concerning her business would be all right. But the only evidence of any business handled by Seek was that relating to the partnership "settlements", the writing of checks on the joint account, and the depositing of dividend checks received by Mrs. Seek in the joint account at her direction.

Two witnesses testified to statements by Seek, one made subsequent to Mrs. Seek's death and the other subsequent to the execution of the will. Willard Summers testified that Seek told him that he and Mrs. Seek were always getting their accounts mixed up at the bank; that they were getting the checks mixed, and that Mrs. Seek suggested that they put their accounts in a joint account. O'Dell testified that, prior to Mrs. Seek's death, Seek told the witness, "I'm going to take over where she quits off, be partners with me"; that he (Seek) was to get all but $2,000 of the estate; and that "As soon as it was all over, he would be partners with me."

Mrs. Parsons testified that she had given a prior statement to counsel for proponent in which she had made the statement that Mrs. Seek talked about her first will and said that it was made like John Summers' will; that this was before testatrix made her last will. Proponent's witness Hull testified that he drew a will for Mrs. Seek about a year before the one drawn by Mr. Moore. No evidence was adduced with reference to the contents of any prior will.

Respondents also rely upon Seek's testimony as to the rumor that oil had been discovered on the Texas land willed to Reba and Omer by Mr. Summers. Seek testified that Mrs. Seek had heard that oil had been discovered on this land and that she was perturbed because she had heard it as a rumor rather than having been informed of it by her adopted chidren. "A. She didn't like it too well, because she (Reba) didn't say nothing to her about it, and told other people." Seek said that he did not bother about nor object to the attitude of Mrs. Seek on this matter.

■ Undue influence and its connection with the will need not be proved by direct evidence but may be established by circumstantial evidence and inferences which may be reasonably drawn from all the evidence; but the cumulative effect of such evidence and such inferences must be sufficiently substantial that a jury may reasonably conclude therefrom that undue influence was in fact exercised. Patton v. Shelton, 328 Mo. 631, 642, 40 S.W. 2d 706, 711[5-9]; Look v. French, 346 Mo. 972, 981[6], 982 [10], 144 S.W. 2d 128, 132[7, 8], 133[14]; State ex rel. Smith v. Hughes, 356 Mo. 1, 7[4], 200 S. W. 2d 360, 363[5].

■ Sufficient evidence to permit a jury to infer undue influence is adduced when contestants have shown by substantial evidence, direct or circumstantial, a fiduciary relation between testator and beneficiary, and other facts and circumstances from which it may be reasonably inferred that such beneficiary did in fact exercise undue influence on the testator such as to cause or bring about the will in question rather than the will which would have been written but for the undue influence. Rex v. Masonic Home of Missouri, 341 Mo. 589, 613[5], 108 S.W. 2d 72, 85[7-11]; Winn v. Matthews, 235 Mo. App. 337, 346, 137 S.W. 2d 632, 635[3, 4]; Hahn v. Brueseke, supra, 155 S.W. 2d 98, 106[8]; Larkin v. Larkin, Mo. Sup., 119 S.W. 2d 351, 358[10-12]; Lastofska v. Lastofska, 339 Mo. 770, 787, 99 S.W. 2d 46, 56[9-13].

Sometimes the rule is stated, that when it is shown that a fiduciary relation existed, benefaction to the party in such relation, and activity by the beneficiary in procuring the execution of the will, a [342] presumption of undue influence arises, a presumption of fact sufficient to make a jury issue on undue influence. Baker v. Spears, 357 Mo. 601, 610[1], 210 S.W. 2d 13, 17[1-4]; Buckner v. Tuggle, 356 Mo. 718, 724, 203 S.W. 2d 449, 452[1-3]; Clark v. Powell, 351 Mo. 1121, 1130[1], 175 S.W. 2d 842, 846[1, 2]. This statement of the rule is accurate provided it is realized, as an examination of the cases applying it will disclose, that ''activity in procuring the execution of the will'' may mean more than mere physical assistance in making arrangements for the drawing and execution of a particular will. The ''activity'' must be such, under the particular circumstances shown, that because of it a reasonable inference may be made that the document in question does not represent the will of the testator; that another's will has been substituted for his own. Baker v. Spears, supra, 210 S.W. 2d 13, 18[5].

■ Clearly, then, what may amount to ''activity'' or ''being active'' or to sufficient ''facts and circumstances'' must depend upon the ''whole picture'' presented by the evidence favorable to contestants. Thus in determining whether there was sufficient evidence in the instant case to make a jury issue on undue influence, we examine the evidence to determine whether there was substantial

evidence from which the jury could reasonably find a "fiduciary relationship" between Mr. and Mrs. Seek and, if so, whether there are sufficient other facts and circumstances in evidence from which it reasonably may be inferred that undue influence was in fact exercised. Important on both of these questions, which are by their very nature interrelated, is the fact that the relationship here existing between testatrix and beneficiary was that of husband and wife. This is important, because the "fiduciary relationship" which, with other facts and circumstances in evidence, will give rise to an inference of undue influence, is a "confidential" or "fiduciary" relationship beyond that which naturally exists by virtue of the usual husband-wife status; and because the facts and circumstances required to permit an inference or raise a presumption where a husband-wife relationship exists may often be greater and perhaps of a different nature than where another relationship exists, such as, doctor-patient, priest-parishioner, nephew-aunt, or testator-stranger. Hern v. Dysart, Mo. Sup., 220 S.W. 908, 910[2]; Page on Wills, Vol. 2, § 822, pp. 628, 629; Shaw v. Butler, Mo. Sup., 78 S.W. 2d 420, 428[6]. This, because it is the rule that a husband or wife may justly and properly influence the making of a will or deed by the other for his or her own benefit, so long as. the influence is not exercised in an improper manner or by improper means, or so long as the influence is not sufficient to have, in effect, substituted the will of one for that of the other, resulting in the prevention of the exercise of independent judgment by the spouse executing the will. White v. McGuffin, Mo. Sup., 246 S.W. 226, 231[2]; Lynn v. Coates, Mo. Sup., 142 S.W. 2d 1014, 1020[3], [4].

A proper. and usual husband and wife relationship in and of itself denotes mutual confidence and, in one sense, each spouse is in a "fiduciary" relationship to the other. It is necessarily something beyond this relationship, however, which must exist as between husband and wife before it may be said that either is the fiduciary of the other within the meaning of "fiduciary" or "confidential" relationship necessary to be established as a basis for an inference or a presumption of undue influence. Contestants' evidence on the question of the existence of a fiduciary relationship between testatrix and defendant-husband, when adequately analyzed, consists of nothing more than showing the performance by defendant of duties and obligations as a husband at the express desire and direction of his wife. Does the fact that the making of the partnership "settlements" was turned over to defendant Seek by his wife, together with the fact that defendant wrote practically all the checks on a joint account established by his wife, constitute sufficient evidence from which a jury could reasonably find a confidential or fiduciary relationship between husband and wife beyond that which naturally exists because of the husband-wife status? We think not.

We have heretofore pointed out that these partnership "settlements" consisted [343] of defendant Seek totaling certain figures which were brought to him by the farm partner of his wife, O'Dell, and determining from the addition of those figures and the prior status of the account between them whether a check was due O'Dell or one due Mrs. Seek. The evidence is that Mr. Seek performed this service because his wife asked him to. There is no evidence that Seek had charge of the farm. In fact, contestants' evidence is to the contrary, viz., that he had nothing to do with the running of the farm on which O'Dell was a tenant. Likewise, there was no evidence as to Seek's handling any of the other farm lands owned by Mrs. Seek or handling any other of her business transactions except as may be indicated by the signing of checks on a joint account.

The joint account was established by Mrs. Seek. There is no evidence that it was established because of any action, proper or improper, on the part of Seek. Respondents stress the statement attributed to Seek after the death of his wife that the account was established because the bank mixed up the checks of Seek with those of Mrs. Seek. Concededly, if their checking accounts were in separate banks, they could not well be mixed. But this statement, made after the death of testatrix, is not evidence from which it may be inferred that Seek was by some improper action responsible for opening the joint account. The fact that practically all the checks on this joint account were signed by Seek is not, in the absence of something more, substantial evidence from which the inference may be drawn that testatrix had in fact turned over to her husband the entire management of her business affairs or the entire management of any substantial portion of her business affairs. And certainly this is true when the only testimony on the subject was to the effect that the account was opened at the direction of Mrs. Seek, and when there was no evidence indicating or suggesting that the canceled checks and bank statements were kept from Mrs. Seek, and in view of the fact that the checks themselves appear to be drawn in payment of legitimate expenses. It is true that the evidence was such that the only fair conclusion is that all the money which went into this joint account was placed there by Mrs. Seek. But this fact has no bearing, as we see it, upon the question of whether the fact of the establishment and existence of a joint account on which almost every check written against it was signed by Seek is substantial evidence of the existence of a fiduciary relation between husband and wife.

It is also important on the question of determining whether a fiduciary relation in fact existed to take into account the physical and mental condition of the testatrix during the period of her marriage to Seek, as well as any other circumstances in evidence which may bear upon the question of the existence of a fiduciary relationship. It is true that even in a husband-wife status, a fiduciary relationship

may exist, and consequently, the mental and physical condition of the husband or wife may in a measure determine the amount of evidence necessary to, or the sufficiency of the facts which are relied upon to, establish a fiduciary relationship. In this case, the testatrix was 83 years old at the time of her death. She had been ill for four years prior to her death and some three years prior to the execution of the will. Contestants' evidence, and any of proponent's evidence which may be said to aid contestants, considered as a whole, abundantly establish that testatrix remained a strong-minded, strong-willed person, independent in her actions. There is nothing in the evidence to indicate that she was in such physical or mental condition at any time prior to her death, and certainly not at the time the joint account was established or at the time Mr. Seek began to make the partnership "settlements", that her directions to Seek with respect to these matters would, under the circumstances, constitute the reposing of a special trust and confidence as to her business affairs over and beyond that usually existing between husband and wife.

We think the evidence goes no farther than to permit as the only reasonable conclusion from it that as to certain specified business matters Seek did specified acts at the request of his wife. The acts were [344] substantially mechanical as opposed to being the result of the exercise of his judgment and decision. The evidence falls short of being sufficient to justify a reasonable inference that Mrs. Seek relinquished control, knowledge, and supervision of her financial and business transactions. It is significant that no evidence was adduced from which it could be inferred that Seek advised his wife as to the conduct of her financial and business matters, or that he induced or persuaded her to pursue a definite course with respect to them, or that he dominated testatrix with respect to business transactions. Shapter v. Boyd, 327 Mo. 397, 415, 37 S.W. 2d 542, 551[10]; Lastofska v. Lastofska, supra; Winn v. Matthews, supra; Larkin v. Larkin, supra, 119 S.W. 2d 357[2].

But even if we assume the existence of a "fiduciary relationship", were there other facts and circumstances in evidence from which it could be reasonably inferred that the will in question was in fact the result of undue influence on the part of defendant Seek? We again consider the physical and mental condition of testatrix, the fact of the husband-wife relationship, and all circumstances shown in evidence from which any fair inference of undue influence may be made. Seek took handwritten notes to an attorney, arranged for the presence of witnesses, and was present himself at the time his wife executed the will. But the evidence shows that Mrs. Seek was unable to journey to the lawyer's office; that she requested her husband to take these notes to the lawyer and ask that the will be drawn. Contestants adduced no evidence that the notes were in the handwriting of defendant Seek.

The only evidence in the record is the testimony of defendant Seek that they were in the writing of testatrix. There was evidence that Mrs. Seek, up to the time of her death, wrote frequent letters to her children; that she had a will prior to the one in question, and it is a fair inference that she was familiar with and had available a copy of the will of her former husband, John Summers. In view of this evidence, it would be unreasonable to infer that the notes were in the handwriting of Seek.

As heretofore noted, the evidence does not indicate that testatrix was in such condition as to be especially susceptible to influence. True, testatrix had been ill. No medical evidence was offered by contestants as to the nature of the illness or of any effect its particular nature might have upon her mental faculties. Proponent's evidence does not aid contestants but, to the contrary, indicated physical disabilities unconnected with mental conditions. No physical disability was shown from which a natural inference would arise that testatrix was so weakened as to be totally reliant upon others. Testatrix was elderly, comparatively old, but there was no substantial evidence to indicate that she was not capable of disposing of her property in accord with her own desires based upon the exercise by her of an independent judgment and free agency. Larkin v. Larkin, supra, 119 S.W. 2d 357[5-7], 358[13]; Hahn v. Brueseke, supra, 155 S.W. 2d 106[7].

The evidence affirmatively showed that no one had ever heard Seek say a word of a derogatory nature concerning the adopted children of Mrs. Seek. Nothing appears from which it may be reasonably inferred that any action or word of his was directed toward changing the feeling of love and affection which testatrix bore for her adopted children and for her grandchild. Jones v. Jones, Mo. App., 260 S.W. 793, 797[1-3].

Respondents point to the testimony of Seek in which he said that he knew that Mrs. Seek was unhappy because she had heard about the children having found oil on their Texas land through rumor rather than direct from the children; that he didn't bother about her attitude on the matter and had no objection to it. Clearly this testimony, undeveloped, does not justify an inference that Seek had started the rumor heard by his wife or that he encouraged her in any attitude toward the children by reason of this incident or otherwise.

While the will left only $1,000 each to the adopted children for whom the testatrix had always displayed love and affection, and left nothing to the [345] grandchild, and this fact is a circumstance for consideration, nevertheless it may scarcely be said that a wife who leaves her estate to her husband has made an unnatural disposition. Look v. French, supra, 144 S.W. 2d 132[10]. No showing was made that the will renounced a prior determined in-

tention, as in Neal v. Caldwell, 326 Mo. 1146, 1161, 34 S.W. 2d 104, 110[16, 17]. Testatrix had a prior will; its terms were not shown.

Respondents attach significance to the fact that defendant Seek married Bernice Summers about four months after the death of testatrix. Respondents designate this fact as significant, but fail to point to the manner in which it bears upon the question of undue influence under the circumstances shown in this record. It was not charged that, and there was no evidence that, defendant Seek conspired with Bernice Summers to exert influence upon testatrix for the purpose of obtaining her estate. The subsequent marriage of defendant husband, in the absence of some evidence which in some way would make the fact of subsequent marriage a link in a chain of circumstances supporting an inference of undue influence, is meaningless on that issue.

We are of the opinion that the "activities" of defendant husband in connection with the execution of the will did not constitute such facts and circumstances which would support a reasonable inference of, or raise a presumption of, undue influence. On the contrary, the "activity" shown under the circumstances here, amounted to nothing more than physical assistance rendered by a husband to a wife under the exigencies of the situation. Shapter v. Boyd, supra, 37 S.W. 2d 550[7, 8]; Jones v. Jones, supra; Winn v. Matthews, supra, 137 S.W. 2d 636[5, 6]; Wright v. Stevens, Mo. Sup., 246 S.W. 2d 817, 821[4, 5].

Considering all of contestants' evidence and other evidence which may aid contestants, in the light of the whole of the evidence most favorable to, and considered most favorably from the standpoint of, contestants, the evidence was insufficient to make an issue for the jury on undue influence.

The judgment is reversed and the cause remanded with directions to the trial court to permit proponents to establish the paper writing as the last will and testament of Damaris Summers Seek, deceased. *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The foregoing opinion by Coil, C., is adopted as the opinion of the court. All the judges concur.