**Nettie POLSKY, Plaintiff-Respondent,**

v.

**Selwyn J. POLSKY et al., Defendants-Appellants.**

**No. 55600.**

Supreme Court of Missouri, Division No. 1.

June 14, 1971.

Motion for Rehearing or for Transfer to Court En Banc Denied June 28, 1971.

Milton F. Napier, William R. Kirby, St. Louis, for respondent.

Robert C. Jones, Ziercher, Tzinberg, Human & Michenfelder, Clayton, for defendants-appellants.

WELBORN, Commissioner.

Nettie Polsky, widow of William V. Polsky, brought suit against the co-executors of her deceased husband's estate, seeking recovery of $30,000 claimed to be due her under an antenuptial agreement. The defendants filed an answer and an offset and counterclaim in three counts. Count I alleged that, by reason of undue influence by plaintiff over her husband, her husband had transferred bank accounts in his name to joint accounts with plaintiff and had also transferred real estate to plaintiff and him-

self as tenants by the entireties. Defendants sought judgment for the amount of the bank accounts and value of the real estate, with offset against plaintiff's claim. Count II sought, on the basis of facts alleged in Count I, to impress a constructive trust on the real property and bank account proceeds. Count III sought, on the same basis, judgment that the transfers to plaintiff were in satisfaction of the antenuptial contract sued upon. After a trial, the circuit court made findings of fact and conclusions of law favorable to plaintiff on her cause of action and against defendants on their offset and counterclaim. Judgment was entered for plaintiff for $33,709.05. Defendants appeal.

William V. Polsky was born in Russia in 1893. He came to the United States at the age of five. He was in the insurance business in St. Louis for many years, prior to the sale of his business in January, 1966.

His first wife died June 20, 1958. His two children by that marriage, Selwyn J. Polsky and Carol May Meyers, are the co-executors of his estate and appellants here. Both are married and have minor children.

William married plaintiff Nettie on March 18, 1962. Prior to the marriage, on March 6, 1962, they had entered into an antenuptial agreement. William agreed to provide Nettie with all reasonable and necessary household expenses, to provide a home for her and to perform his duties as a husband and treat her with kindness and affection. Nettie agreed to perform the usual duties as a wife and to treat William with kindness and affection. William agreed that he would direct his executor, upon his death, to pay Nettie $30,000. Nettie agreed in return to relinquish all of her claims against the estate of William by virtue of her status as his wife.

William and Nettie lived in William's apartment, in a four-unit apartment building owned by William, located at 7258 Forsyth in St. Louis County.

On March 21, 1964, William executed his will in which he noted the existence of the antenuptial agreement with Nettie. The will provided that Nettie might occupy the apartment at 7258 Forsyth until her death or remarriage.

In August, 1965, William suffered a stroke and was hospitalized from August 22 to October 3, 1965. He was hospitalized from December 10 to December 22, 1965, with a second stroke. From January 28 to January 31, 1966, he was hospitalized with a bladder infection.

On August 30, 1966, deeds were prepared and executed by which William and Nettie transferred the property at 7258 Forsyth to a straw party who in turn transferred it to William and Nettie as tenants by the entireties. On December 13, 1966, William executed a codicil to his will. The codicil made changes in bequests to the testator's grandchildren. Otherwise, it ratified the provisions of the prior will.

William died June 15, 1967. His personal estate was inventoried at $110,575.11.

When payment to Nettie under the antenuptial agreement was not made, she filed this action which was consolidated with a prior claim she had filed in the Probate Court of St. Louis County and which had been certified to the circuit court.

In addition to the transfer of the apartment, appellants' counterclaim attacks the following transactions:

1. William had two accounts in the First National Bank of Wellston. One was in the name of William Polsky, d/b/a Fidelity Insurance Agency, and the other was Polsky, c/o Fidelity Insurance Agency. On August 10, 1965, signature cards were submitted whereby each account became a joint account, with Nettie's name being added. The d/b/a account was closed July 27, 1966. The other account was closed with the withdrawal of $1,639.34 on July 11, 1967, subsequent to William's death.

2. The deposit of $10,000 in the Mercantile Trust Company, evidenced by certificate of deposit dated June 29, 1966, in

the joint names of William and Nettie. This certificate was reissued to Nettie and her brother following William's death.

3. William had an account with Prudential Savings and Loan Association. On June 17, 1966, Nettie's name was added through a signature card on which William's name was typewritten. On June 29, 1966, Nettie withdrew the balance in the account of $8,308.34. The $10,000 Mercantile deposit was made on June 29, 1966. On June 30, 1966, a check for $1,691.66 was charged against the d/b/a account in the Wellston bank, referred to above. That sum and the withdrawal from Prudential total $10,000, the amount of the Mercantile deposit.

4. William had an account in the St. Louis County National Bank. On August 26, 1965, he executed a power of attorney, authorizing Nettie to draw on the account. On August 15, 1966, the account was transferred to a joint account between William and Nettie. Following William's death, the balance of $3,737.48 was transferred to a new account in Nettie's name. Subsequently Nettie transferred the balance in her account to a joint account with her brother. At the time of William's death, there were also outstanding two certificates of deposit in the amount of $5,000 each in the joint names of William and Nettie. One was dated May 12, 1966. The second was dated January 24, 1967. It superseded a previous certificate dated January 24, 1966, for $5,000.

The trial court found that plaintiff had performed the conditions of the antenuptial contract. The overwhelming evidence supports the trial court's findings. Appellants suggest that there was no evidence of any act of consummation of the marriage. For purposes of the agreement, the consummation lay in the performance of the marriage ceremony and subsequent cohabitation as man and wife. Defendants' answer admitted the marriage of William and Nettie. The argument that plaintiff did not treat her husband in a wifely manner, but, to the contrary, took advantage of her

position and his physical weakness to obtain $36,000 in bank accounts and $38,000 worth of real estate in excess of what the antenuptial agreement entitled her to is necessarily interwoven with the contention that the trial court should have found that the transfers of the bank accounts and real estate were the result of plaintiff's exercise of undue influence over her husband. Since that is the principal thrust of appellants' argument here, that issue must be examined.

The evidence on both sides showed that after William suffered a stroke in August, 1965, he was confined to his home (except for subsequent hospitalization) and physically incapacitated. He could walk only with the aid of a walker. He could no longer use his right hand but learned to sign his name with his left hand. His voice gradually weakened. Defendants' evidence was that eventually he was unable to speak. Plaintiff's evidence was that he was able to carry on a conversation to practically the time of his death.

The essential thrust of defendants' evidence was that by reason of his physical incapacity William became dependent upon his wife and whoever assisted her to take care of all his physical needs.

The trial court, by its findings, rejected evidence of William's physical condition as bearing on the issue of undue influence. The trial court held that, in the absence of pleading and proof of lack of mental capacity, it would not consider evidence going "largely to (William's) physical disability" and which did not support any lack of mental capacity.

Appellants here contend that William's physical condition was a factor to be considered in determining whether or not a confidential relationship existed between William and Nettie such as would impose some burden upon Nettie to show the nature of her dealings with William with respect to his property.

Cases in Missouri have held that the relationship of husband and wife is not, alone,

such a relationship as will produce the consequences generally ascribed to a "confidential relationship." "It is true that the fact alone of a husband-wife relationship does not establish a 'fiduciary' relationship within the meaning of a 'confidential or fiduciary' (used synonymously) relationship, such as, for example, that relationship necessary to raise an inference of undue influence." Wilber v. Wilber, Mo.Sup., 312 S.W.2d 86, 90–91 [5, 6]. "A proper and usual husband and wife relationship in and of itself denotes mutual confidence and, in one sense, each spouse is in a 'fiduciary' relationship to the other. It is necessarily something beyond this relationship, however, which must exist as between husband and wife before it may be said that either is the fiduciary of the other within the meaning of 'fiduciary' or 'confidential' relationship necessary to be established as a basis for an inference or a presumption of undue influence." Snell v. Seek, 363 Mo. 225, 250 S.W. 2d 336, 342 [8].

Cases in Missouri have also indicated that physical incapacity is a factor to be considered in determining whether one party to a transaction is in a position of domination and control over the other. Patton et al. v. Shelton et al., 328 Mo. 631, 40 S.W.2d 706, 713 [15]; Manahan v. Manahan, Mo. Sup., 52 S.W.2d 825, 828. Therefore, the trial court should have considered evidence relating to William's physical capacity. Nor, despite the ruling expressed in the findings, does it appear that the court's consideration of the case did exclude entirely such evidence. Indeed, the greater part of the evidence considered did deal with the physical condition of William. The evidence which the trial court declined to consider was primarily the documentary evidence relative to the transactions objected to by appellants. The proper import of the court's declaration would thus appear to be that the fact of such transactions between a wife and her physically incapacitated husband does not produce any inference of undue influence on the part of the wife.

■ This conclusion is in accord with the rule that proof of a confidential relationship, without more, does not give rise to an inference of undue influence. Sebree v. Rosen, Mo.Sup., 349 S.W.2d 865, 873 [9].

Appellants acknowledge that something more is required because they urge as a part of the "elements of the claim of undue influence upon which defendants must prevail * * * 4. Dependence upon another person by virtue of incapacity."

■ This factor must involve dependence in the transactions under scrutiny. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 706 [13–18]. A husband, incapacited as was William here, is necessarily dependent upon his wife or someone else insofar as his physical activity is concerned. However, such dependency does not necessarily extend to financial transactions. The evidence here is markedly absent as to the decedent's ability to manage his financial affairs. In fact, the evidence found credible by the trial court pointed to his competency in that regard. We defer to the trial court's findings on the conflicting evidence before it.

The purchaser of the decedent's insurance business in January, 1966, testified that he dealt solely with William and that William was fully aware of the transaction and furthermore followed the course of the business after the sale had been made. A tenant of the apartment testified that, shortly before his death, William was aware that she was in default in her rent. The conclusion to be drawn from the evidence is that William retained his ability to manage his financial affairs, despite his physical handicap.

The appellants produced no evidence that the idea for any of the contested transactions originated with plaintiff. There was evidence on this score only on the transfer of the apartment. That evidence, presented by plaintiff, showed that the attorney who prepared the deed did so after he had visited William in response to a telephone call from William. The attorney's testimony was that

William realized what he wished to do and that the deed was prepared in response to William's expressed wishes.

Appellants rely upon the addition of plaintiff's name on the Fidelity Insurance Agency account in the Wellston bank as evidencing that plaintiff and William were both engaged in the operation of the business, thus evidencing a confidential relationship. Other than the bank account, there is no evidence whatsoever that plaintiff was in any way connected with the operation of William's business. The purchaser of the business dealt solely with William. The terms of the sale were arrived at between William and the purchaser. This evidence is sufficient to rebut any inference, based solely upon the bank account, of a joint business venture between plaintiff and William.

Appellants' evidence failed to show facts which would give rise to a confidential or fiduciary relationship between plaintiff and William. Certainly it failed to show directly the exercise of undue influence by plaintiff over William. Appellants emphasize the testimony of their witnesses that plaintiff was always by William's side and that whenever they visited William's apartment the television was turned on so loud that conversation was impossible. They seek to draw the inference from this evidence that plaintiff deliberately sought to prevent conversation between William and his children. Again, plaintiff's evidence on this score was to the contrary. The trial court rejected the appellants' evidence in this regard. Even if appellants' evidence were accepted, it would not provide the necessary inference of undue influence. As the trial court pointed out, even appellants' evidence showed that the family visits were frequently for dinner on Sunday evening, at which plaintiff prepared the meals. Such activity on her part required her to leave William's side and afforded opportunity for members of his family to visit with him without plaintiff's presence. The evidence simply does not support appellants' theory that plaintiff was attempting to shield William from his own children and thereby conceal her improper activities in her own behalf.

Appellants argue that plaintiff held a threat of sending him to a nursing home over William's head. There was evidence that William did express dislike for nursing homes, but no evidence whatsoever that plaintiff in any manner threatened him with such treatment.

Cases such as this involve primarily factual issues. This Court is reluctant to disregard the findings of the trial judge who is in a much better position to assess the conflicting evidence invariably generated by such cases. Without enumerating them here, the authorities relied upon by appellants demonstrate the reluctance of appellate courts to reject the findings of the trial court. None of appellants' cases presents a factual situation comparable with that here.

Even if the evidence here rejected by the trial court is considered, it does not call for any different finding on the basic issues. Appellants, upon whom the burden of proving undue influence fell, simply failed to meet that burden. See White v. McGuffin, Mo.Sup., 246 S.W. 226. There is no evidence whatsoever to call for a finding that plaintiff was a constructive trustee and none that the transfers to plaintiff were intended as satisfaction of the obligation under the antenuptial agreement. Therefore, the judgment of the trial court must be affirmed.

Judgment affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

SEILER, P. J., BARDGETT, J., and SEMPLE, Sp. J., concur.

HOLMAN, J., not sitting.